PEOPLE v STANAWAY

PEOPLE v CARUSO

Docket Nos. 92269, 96823. Argued January 13, 1994 (Calendar Nos.
12-13). Decided August 29, 1994. Certiorari denied by the Su-
preme Court of the United States on January 17, 1995, 513 US
— (1995).

Brian S. Stanaway was convicted by a jury in the Marquette
Circuit Court, Edward A. Quinnell, J., of three counts of third-
degree criminal sexual conduct. Before trial, the defendant
twice moved for direct access to the records of a social worker
and a sexual assault counselor regarding the complainant,
arguing that they might contain inconsistent statements or
might lead to exculpatory evidence, but admitting that he had
no basis for a good-faith belief that such information would be
found. Both motions were denied. The Court of Appeals,
GRIFFIN, P.J., and SAWYER and WEAVER, JJ., affirmed in an un-
published opinion per curiam (Docket No. 130448). The defendant
appeals.

Stanley H. Caruso was charged in the Kent Circuit Court with
second-degree criminal sexual conduct. The court, H. David
Soet, J., granted the defendant's motion for production of the
complainant's counseling records for a review in camera. The
Court of Appeals, MARILYN J. KELLY, P.J., and NEFF, J.
(MACKENZIE, J., concurring), affirmed in an unpublished opinion
per curiam (Docket No. 157437). The people appeal.

In an opinion by Justice BRICKLEY, joined by Chief Justice
CAVANAGH, and Justices LEVIN, GRIFFIN, and MALLETT, the
Supreme Court held:

Where a defendant can establish a reasonable probability
that privileged counseling and juvenile diversion records are
likely to contain material information necessary to the defense,

REFERENCES

Am Jur 2d, Depositions and Discovery §§ 425, 436, 437, 449.

Physician-patient privilege as extending to patient's medical or
hospital records. 10 ALR4th 552.

Books, papers, and documents subject to discovery by defendant
under Rule 16 of Federal Rules of Criminal Procedure. 108 ALR
Fed 380.

a review of those records in camera must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential, to the defense. Only when the trial court finds such evidence should it be provided to the defendant.

1. Statutes that render privileged records of contacts between sexual assault counselors and victims and social workers and clients and records kept pursuant to juvenile diversion programs shield potentially reliable evidence in an attempt to foster relationships of trust, and inhibit rather than facilitate the search for truth. Thus, such privileges are not easily found or endorsed by the courts, and their existence and scope ultimately turn on the language and meaning of the statutes that create them. In these cases, the clear and unambiguous language of the statutes precludes admission of the records sought for purposes of impeachment or as exculpatory evidence in civil or criminal trials.

2. There is no general constitutional right of discovery in a criminal case. At a minimum, criminal defendants have the right to put before a jury evidence that might influence the determination of guilt. In an appropriate case, the option of inspection of privileged information in camera by the trial judge should be available on a showing by the defendant of a good-faith belief, grounded on some demonstrable fact, that there is a reasonable probability that the records are likely to contain material information necessary to the defense. Such inspection strikes the delicate balance between the defendant's federal and state constitutional rights to discover exculpatory evidence shielded by privilege, and the Legislature's interest in protecting the confidentiality of the therapeutic setting. Only after the court has conducted the inspection and is satisfied that the records reveal evidence necessary to the defense should the evidence be supplied to defense counsel. The presence of defense counsel at the inspection is not essential to protect the defendant's rights and would undermine the privilege unnecessarily.

3. In *Stanaway,* the defendant's generalized assertion of a need to attack the credibility of his accuser is not sufficient to establish the necessary showing of a reasonable probability that the records contain information material to his defense to overcome the statutory privileges. While the prosecutor's reference during closing argument to the substance of the confidential disclosures was improper, it does not require reversal because there was no objection, and a cautionary instruction could have cured the misleading inference. However, it was an

abuse of discretion for the trial court to allow, despite defense objections, the improper impeachment of a prosecution witness with hearsay testimony that was highly prejudicial, requiring reversal of the defendant's conviction and remand for a new trial.

4. In *Caruso*, the defendant's assertion of particularized facts would support a determination that a review of the victim's counseling records in camera is required. Because the defendant demonstrated a good-faith belief, grounded in arguable fact, that there is a reasonable probability that the records at issue contain material information necessary to his defense, vacation of the judgment of the Court of Appeals and remand to the trial court is required for a determination whether review of the victim's counseling records in camera must be ordered.

Justice RILEY, concurring, stated that despite the limited guidance of the harmless-error statute and the court rules, the Supreme Court has yet to fully examine the relevant considerations for nonconstitutional harmless error and to set forth a clear and concise harmless-error test. The vague concept of injustice to be gleaned from a plain reading of the statute and court rules does not provide any meaningful help to appellate courts in reviewing nonconstitutional harmless error.

An assumption that the federal constitutional harmless-error rule applies to nonconstitutional error fails to recognize that there are important state considerations relevant to the inquiry, including the policies in the statute and court rules, that have yet to be examined.

While full consideration of the issue must await full briefing and argument, in this case the admission of the officer's hearsay testimony resulted in a miscarriage of justice and cannot be deemed harmless.

Justice BOYLE, joined by Justice RILEY, concurring, stated that the test for review in camera of privileged information is a plausible showing of need and materiality. The test for disclosure and use is whether there is a reasonable probability that material and necessary information would affect the factfinder's determination of guilt or innocence. The issues are the nature of the privilege asserted, the test for review in camera, the test for determining when constitutional materiality requires discovery or use of protected information, and the remedy for nondisclosure. The majority creates too rigid a barrier to a defendant's request for review in camera, treats all privileges as functionally equivalent, confuses the standard for review in camera with the test for disclosure, and assumes that

the remedy appropriate to resistance to discovery of all information protected by an absolute privilege is striking the witness' testimony. Its rationale is based on two dubious grounds, one that unnecessarily limits a defendant's right to review in camera, and a second that limits the viability of all privileges.

There are two types of privileges: conditional or qualified privileges and absolute privileges. Statutes protecting confidential communications are construed to protect the communications from extrajudicial disclosure. Absolute privileges are those that expressly protect all disclosure, in court as well as out of court. Conditional or qualified privileges, which do not expressly bar disclosures in court, do not create an exception to judicial control under the Rules of Evidence. Review in camera should be available on a showing of plausible need and materiality. The failure of the majority to distinguish between privileges that do not bar disclosure in court and those that do leads to the erroneous conclusion that where a defendant makes the requisite showing for review in camera, the holder of an absolute privilege may continue to refuse to submit the protected information resulting in the holder's testimony being struck. When privileges can be appropriately narrowed to avoid such clashes, and a sufficient showing overrides a privilege of confidentiality, the order to the holder to disclose in camera, protects the privileged information, and the result of noncompliance may be contempt. Only when the privilege is absolute, and its purpose will be destroyed by invasion, will disclosure be dependent on waiver by the privilege holder.

Where a due process right to discovery is asserted and a privilege is invoked, the first step is to examine the basis for the defendant's request. Where the defendant makes a plausible showing of materiality and favorability to the case, further consideration is in order, and a determination whether the privilege is absolute or conditional is necessary to assess whether further deliberation is called for before review in camera is warranted. Where the statute establishing the privilege fairly permits a construction that disclosure in camera can be required as a screening device, examination in camera is appropriate. Even if the privilege invoked is absolute, if it cannot be said that review in camera would destroy the ends sought through the privileged communication, such review still may be proper. However, where the privilege cannot be narrowed, and review in camera itself would destroy its purpose, continued scrutiny is inappropriate and may not be conducted unless the privilege holder yields. Failing that, the prosecutor must accept the burden of upholding the privilege.

The test for disclosure is whether the protected material is

both necessary and constitutionally material. The standard does not vary with the nature of the privilege.

The psychologist-patient privilege involved in *Caruso* is an absolute privilege protecting private communications. Although the defendant initially did not make a sufficient showing of plausible materiality, on remand the trial court should consider how allegedly truncated counseling, stemming from prior sexual abuse, is plausibly material to the claim of fabrication. If such a showing is made, the court must determine whether review in camera would destroy the privilege.

In *Stanaway,* the defendant failed to demonstrate the plausible materiality of the requested records protected by the sexual assault counselor-victim privilege. Although the social worker-client and juvenile diversion records sought by the defendant do not possess the same absolute character as the other privileges at issue in these cases, the defendant's generalized assertions also failed to make a plausible showing of materiality, and thus review of the records was properly denied.

Justice LEVIN, writing separately, stated that a lawyer for the accused should be permitted to participate in an in camera examination of privileged documents.

It is extremely difficult for even the most able and experienced trial judge under the pressures of conducting a trial to pick out all the information that would be useful in impeaching a witness. Nor is it realistic to assume that the trial court's judgment regarding the utility of material for impeachment would exhaust the possibilities. In an adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate.

Although these procedures would result in counsel for the defendant and the state, rather than just the judge, viewing privileged records, if careful precautions are taken, such breaches of confidentiality need not be any more intrusive or harmful than those attending in camera review of records by the judge alone.

*Stanaway,* reversed and remanded.

*Caruso,* vacated and remanded.

EVIDENCE — CONFIDENTIAL RECORDS — REVIEW IN CAMERA.

Where a defendant can establish a reasonable probability that privileged counseling and juvenile diversion records are likely to contain material information necessary to the defense, a review of those records in camera must be conducted to ascertain whether they contain evidence that is reasonably neces-

sary, and therefore essential, to the defense; only when the trial court finds such evidence should it be provided to the defendant.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Gary L. Walker,* Prosecuting Attorney, and *Terrence E. Dean* and *Matthew J. Wiese,* Assistant Prosecuting Attorneys, for the people in *Stanaway.*

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *William A. Forsyth,* Prosecuting Attorney, and *Timothy K. McMorrow,* Chief Appellate Attorney, for the people in *Caruso.*

*Mark Peter Stevens* for Stanaway.

*Vander Werff Law Office, P.C.* (by *Sara E. Vander Werff*), for Caruso.

Amici Curiae:

*Summers & Pence* (by *Steven L. Pence* and *Lynn A. Moon*) for Alger-Marquette Community Mental Health.

*Andrews, Fosmire, Solka & Stenton, P.C.* (by *Cheryl L. Hill*), for Francis van der Maarel, Diversion Counselor of the Juvenile Division of Marquette County Probate Court.

*Finkbeiner & Burnham, P.C.* (by *Priscilla S. Burnham*), for Cathy O'Day Preston, Kim Gustafson, and Marquette Women's Center.

*David A. Moran* for Criminal Defense Attorneys of Michigan.

BRICKLEY, J. This case presents the question whether, and under what circumstances, records of

a psychologist, a sexual assault counselor, a social worker, or a juvenile diversion officer regarding a witness should be discoverable by the accused in a criminal trial. To the extent the records are privileged under MCL 330.1750; MSA 14.800(750), MCL 600.2157a(2); MSA 27A.2157(1)(2), MCL 339.1610; MSA 18.425(1610), and MCL 722.826-722.829; MSA 25.243(56)-25.243(59), respectively, resolution requires a determination whether defendant's federal and state constitutional rights of due process require a pretrial review of the requested records before trial.[1]

This Court is faced with the difficult task of reconciling the state's compelling interest in protecting the confidentiality of counseling and juvenile diversion records with the defendant's federal and state constitutional rights to obtain evidence necessary to his defense in a criminal trial. We hold that where a defendant can establish a reasonable probability that the privileged records are likely to contain material information necessary to his defense, an in camera review of those records

[1] This is a consolidated case. Both defendants presented arguments regarding the Sixth Amendment right of confrontation and compulsory process. Because we decide this case on the basis of a due process analysis, we do not address these issues beyond stating that any confrontation or compulsory process rights implicated are sufficiently protected by an in camera review when due process compels that result. *Pennsylvania v Ritchie,* 480 US 39, 56; 107 S Ct 989; 94 L Ed 2d 40 (1987). Michigan courts have routinely adopted federal law when examining the right of confrontation. *People v LaLone,* 432 Mich 103; 437 NW2d 611 (1989).

Where the United States and Michigan Constitutions contain virtually identical provisions, as is the case when the Sixth Amendment of the United States Constitution is compared to art 1, § 20 of the Michigan Constitution of 1963, federal construction of the constitution should be followed absent compelling reasons for an expansive interpretation of the state constitution. *Sitz v Dep't of State Police,* 443 Mich 744; 506 NW2d 209 (1993).

We note that the Sixth Amendment would be directly implicated by the request to *use* at trial evidence subject to statutory privilege. *Davis v Alaska,* 415 US 308; 94 S Ct 1105; 39 L Ed 2d 347 (1974); *People v LaLone, supra; People v Adamski,* 198 Mich App 133; 497 NW2d 546 (1993).

must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential, to the defense. Only when the trial court finds such evidence, should it be provided to the defendant.

The procedure we adopt today attempts to balance the Legislature's interest in protecting the confidentiality of the therapeutic setting with the possibility that there may be exculpatory evidence in such records necessary to prevent the conviction of an innocent person.

In *People v Stanaway,* we affirm the trial court's denial of an in camera review of the victim's counseling records. The defendant's generalized assertion of a need to attack the credibility of his accuser did not establish the threshold showing of a reasonable probability that the records contain information material to his defense sufficient to overcome the various statutory privileges. However, we hold that the trial court abused its discretion when it allowed the improper impeachment of a prosecution witness with hearsay testimony that was highly prejudicial. We reverse Stanaway's conviction and remand for a new trial because the error was not harmless.

In *People v Caruso,* we remand to the trial court for a determination of whether an in camera review of the victim's counseling records is warranted. If the defendant has demonstrated a good-faith belief, grounded in articulable fact, that there is a reasonable probability that the records contain material information necessary to his defense such an inspection should be conducted by the trial judge.

I

A. *PEOPLE v STANAWAY*

Defendant Brian Stanaway was charged with

three counts of third-degree criminal sexual conduct[2] involving sexual intercourse with the complainant on three separate occasions during the summer of 1988 when she was fourteen years old. The complainant testified during direct examination that she discussed these incidents with a counselor over a year after they happened. The counselor reported the allegations to the police pursuant to the mandatory disclosure requirements of MCL 722.623; MSA 25.248(3).[3]

Before trial, Stanaway's defense counsel filed a motion that sought direct access to the records of a social worker in the juvenile diversion program and a sexual assault counselor regarding the complainant. The defendant argued that the records might contain inconsistent statements or might lead to exculpatory evidence, but admitted he had no basis for a good-faith belief that it was probable such information would be found.[4] This request was repeated on the morning of trial. Both motions were denied by the trial court.[5]

The complaining witness testified at trial that

---

[2] MCL 750.520d(1)(a); MSA 28.788(4)(1)(a).

[3] MCL 722.623(1); MSA 25.248(3)(1) provides in part:

A physician, coroner, dentist, medical examiner, nurse, a person licensed to provide emergency medical care, audiologist, psychologist, family therapist, certified social worker, social worker, social work technician, school administrator, school counselor or teacher, law enforcement officer, or regulated child care provider who has reasonable cause to suspect child abuse or neglect shall make immediately, by telephone or otherwise, an oral report, or cause an oral report to be made, of the suspected child abuse or neglect to the department.

[4] Defendant's April 20, 1990 Memorandum of Law—Privilege and Discovery.

[5] The challenged discovery requests were to paragraphs 8-11 of defendant's April 6, 1990 motion for discovery:

8. The Defendant also demands the names and addresses,

she knew the defendant and baby-sat for him and his wife for some time. She stated that the first incident occurred on a summer night in 1988. She had sneaked out of her home during the night to talk to the defendant's nephew, Terry Stanaway. The nephew was staying in a tent outside the defendant's house. She said the defendant asked her to have sex with him and she responded that she did not want to. She related that the defendant pulled down her pants and underwear and that sexual intercourse occurred outside, in the yard, near the tent.

A second incident occurred two weeks later. The witness stated she was visiting her aunt who lived on the same block as the defendant. She was in the backyard when another nephew of the defendant, Ricky Stanaway, called to her. Ricky indicated that the defendant was in the house and wanted to talk to her. Once in the house, Ricky told her the defendant was in the bathroom and that she should just knock and he would let her in. She knocked and entered and the defendant closed the door behind her. She said the defendant was naked and indicated to her that he wanted to have sex. She said she repeated that she did not want to. Again the defendant pulled down her

and the contact person, of any agency, program, or counseling assistance that [the complainant] sought for either treatment or diagnosis after the occurrence of the alleged sexual assault.

9. The Defendant also demands any written observation, document, record or memoranda prepared by Cathy O'Day or any other member of the Marquette Woman's Crisis Center, or by any member of the Marquette County Juvenile Diversion Counseling Program that pertains to this matter or the aforesaid agencies or programs contact with [the complainant].

10. The Defendant also demands the records of the Juvenile Center Diversion Program pertaining to [the complainant].

11. The Defendant also demands the names of any psychiatrist or psychologist, social worker or counselor that [the complainant] consulted for diagnosis or treatment before the alleged sexual occurrence.

pants and underwear and sexual intercourse occurred on the bathroom floor.

The witness testified that the third incident happened later that summer. She could not remember the circumstances of how it came to be that she was at the defendant's house but she said sexual intercourse took place on a single bed in a back bedroom. She remembered the defendant getting a towel to clean off the bed afterwards.

The defendant testified on his own behalf. He denied having any sexual contact with the complainant. He said there was no tent in the yard at the time in question. He said she was never in his house except to baby-sit and he and his wife would have been gone together.

The jury convicted the defendant on all three counts. In the Court of Appeals, defendant challenged the denial of discovery, the admittance of testimony by a police officer regarding a statement made by a nephew of the defendant, statements made by the prosecutor during closing arguments and the ineffectiveness of his trial counsel. The Court of Appeals affirmed the defendant's conviction in an unpublished opinion per curiam, issued August 14, 1991 (Docket No. 130448).

On the basis of statements made by the prosecutor that suggested access to the records in question, this Court entered an order directing the trial judge to conduct an in camera review of the requested documents. That order was later modified in response to motions to intervene filed by the social worker, the rape crisis counselor, and the mental health clinic. Although the motions to intervene eventually were denied, the prosecutor instead was ordered to file a written response explaining the basis for the statements made during closing arguments regarding what the complaining witness told counselors. Specifically, the

prosecutor was directed to identify which counseling records were made available to him or were in his possession before trial. Upon receipt of the prosecutor's response, indicating he did not have pretrial access to any of the counseling records, this Court directed the trial judge to make a finding of fact on the issue. After hearing testimony from the prosecutor who tried the case, the trial judge determined that the source of any references made by the prosecutor during closing arguments was the complainant's trial testimony. The judge further determined that none of the counseling records had been provided to the prosecutor. We granted leave to appeal. 444 Mich 876 (1993).

### B. *PEOPLE v CARUSO*

Defendant Stanley Caruso is charged with second-degree criminal sexual conduct.[6] The charges are based on allegations by his niece that the defendant rubbed her private with his hand during a visit when she was eight years old. The allegation surfaced when the child wrote a note to her mother's live-in boyfriend about the alleged incident.

Before trial, defense counsel moved to obtain the complainant's counseling records, asserting that there was good reason to believe the complainant had been the victim of sexual abuse by her biological father. It was further suggested that this may not have been the first note written to the live-in boyfriend of a sexual nature. It was believed by the defense that the child had written at least one prior note in which she suggested she wanted to

---

[6] MCL 750.520c; MSA 28.788(3).

have sex with him in the car.[7] The circuit court granted defendant's motion and entered an order for production of the records for an in camera review.

The Court of Appeals granted the prosecutor's interlocutory emergency motion for immediate consideration, but affirmed the trial court's order requiring production for an in camera review.[8] Unpublished opinion per curiam, issued May 25, 1993 (Docket No. 157437). This Court granted leave to appeal with *People v Stanaway*. 444 Mich 876 (1993).

II

The first issue to decide is whether the various statutory privileges are intended to shield disclosure of this evidence and, if so, whether they violate the defendants' rights under US Const, Ams VI, XIV, and Const 1963, art 1, §§ 17, 20.

### A. THE STATUTORY PRIVILEGES

In opposition to defendant Stanaway's discovery motion, the prosecutor asserted that the records at

---

[7] This assertion was supported by the preliminary examination testimony of a witness for the defense who stated he had read the note and was present when the note was presented to the mother's boyfriend.

[8] The Court of Appeals cited *People v Adamski*, n 1 *supra*, as authority for the correct resolution of the collision between the constitutional right of confrontation and the statutory psychologist-patient privilege.

The defendant in *Adamski* had somehow obtained confidential communications between the complainant and a mental health counselor. At trial, the judge ruled that the statements were inadmissible for impeachment purposes because they were privileged under MCL 330.1750; MSA 14.800(750). The Court of Appeals held that the proper inquiry regarding admissibility must include a determination whether exclusion on the basis of the statutory privilege would "unduly infringe[ ]" on the defendant's right of confrontation. If so, the privilege must yield. *Id.*, p 141.

issue were privileged under Michigan's statutory
sexual assault counselor-victim privilege, MCL
600.2157a(2); MSA 27A.2157(1)(2);[9] social worker-
client privilege, MCL 339.1610; MSA 18.425(1610);[10]

---

[9] MCL 600.2157a; MSA 27A.2157(1) provides:

(1) For purposes of this section:
(a) "Confidential communication" means information trans-
mitted between a victim and a sexual assault or domestic
violence counselor, or between a victim or sexual assault or
domestic violence counselor and any other person to whom
disclosure is reasonably necessary to further the interests of
the victim, in connection with the rendering of advice, counsel-
ing, or other assistance by the sexual assault or domestic
violence counselor to the victim.
(b) "Domestic violence" means that term as defined in section
1501 of Act No. 389 of the Public Acts of 1978, being section
400.1501 of the Michigan Compiled Laws.
(c) "Sexual assault" means assault with intent to commit
criminal sexual conduct.
(d) "Sexual assault or domestic violence counselor" means a
person who is employed at or who volunteers service at a
sexual assault or domestic violence crisis center, and who in
that capacity provides advice, counseling, or other assistance to
victims of sexual assault or domestic violence and their fami-
lies.
(e) "Sexual assault or domestic violence crisis center" means
an office, institution, agency, or center which offers assistance
to victims of sexual assault or domestic violence and their
families through crisis intervention and counseling.
(f) "Victim" means a person who was or who alleges to have
been the subject of a sexual assault or of domestic violence.
(2) Except as provided by section 11 of the child protection
law, Act No. 238 of the Public Acts of 1975, being section
722.631 of the Michigan Compiled Laws, a confidential commu-
nication, or any report, working paper, or statement contained
in a report or working paper, given or made in connection with
a consultation between a victim and a sexual assault or domes-
tic violence counselor, shall not be admissible as evidence in
any civil or criminal proceeding without the prior written
consent of the victim.

[10] MCL 339.1610; MSA 18.425(1610) provides:

(1) A person registered as a certified social worker, social
worker, or social work technician or an employee or officer of
an agency for whom the certified social worker, social worker,
or social work technician is employed shall not be required to
disclose a communication or a portion of a communication

and the statutory provisions regarding records kept pursuant to the juvenile diversion program, MCL 722.828-722.829; MSA 25.243(58)-25.243(59).[11] The prosecutor asserted that because the juvenile diversion officer held a master's degree in social work and had provided counseling services to the

made by a client to the person or advice given in the course of professional employment.

(2) Except as otherwise provided in this section, a communication between a certified social worker, social worker, or social work technician or an agency of which the certified social worker, social worker, or social work technician is an agent and a person counseled is confidential. This privilege is not subject to waiver except when the disclosure is part of the required supervisory process within the agency for which the certified social worker, social worker, or social work technician is employed; or except where so waived by the client or a person authorized to act in the client's behalf. The certified social worker, social worker, or social work technician shall submit to the appropriate court a written evaluation of the prospect or prognosis of a particular case without divulging a fact or revealing a confidential disclosure when requested by a court for a court action.

[11] The juvenile statutes regarding disclosure of records provides in § 8:

(1) Except as otherwise required in subsection (2), a record required to be kept under this act shall be open only by order of the court to persons having a legitimate interest.

(2) A record required to be kept under this act shall be open to a law enforcement agency or court intake worker for only the purpose of deciding whether to divert a minor.

(3) A minor's record kept under this act shall be destroyed within 28 days after the minor becomes 17 years of age. [MCL 722.828; MSA 25.243(58).]

Section 9 of the statute provides the following penalty for violations regarding the use of the juvenile diversion record:

(1) A record kept under this act shall not be used by any person, including a court official or law enforcement official, for any purpose except in making a decision on whether to divert a minor.

(2) A person who violates this section is guilty of a misdemeanor, punishable by imprisonment for not more than 180 days, or a fine of not more than $1,000.00, or both. [MCL 722.829; MSA 25.243(59).]

complainant as part of diversion, the social worker-client privilege barred disclosure.

In opposition to defendant Caruso's discovery request, the prosecutor asserted that the records requested were absolutely privileged under Michigan's statutory psychologist-patient privilege, MCL 330.1750; MSA 14.800(750).[12]

Unlike other evidentiary rules that exclude evidence because it is potentially unreliable, privilege statutes shield potentially reliable evidence in an attempt to foster relationships. Westen, *The compulsory process clause,* 73 Mich L R 71, 160-161 (1974). While the assurance of confidentiality may encourage relationships of trust, privileges inhibit rather than facilitate the search for truth. 1 McCormick, Evidence (4th ed), § 72, pp 268-270. Privileges therefore are not easily found or endorsed by the courts. "The existence and scope of a statutory privilege ultimately turns on the language and meaning of the statute itself." *Howe v Detroit Free Press,* 440 Mich 203, 211; 487 NW2d 374 (1992). Even so, the goal of statutory construction is to ascertain and facilitate the intent of the Legislature. *People v Love,* 425 Mich 691, 705; 391 NW2d 738 (1986).

The Legislature expressly provided that confidential communications made to a sexual or domestic assault counselor "shall not be admissible as evidence in any civil or criminal proceeding without the prior written consent of the victim."

---

[12] Section 750(2) of the statute provides:

Privileged communications shall not be disclosed in civil, criminal, legislative, or administrative cases or proceedings, or in proceedings preliminary to such cases or proceedings, unless the patient has waived the privilege, except in the circumstances set forth in this section. [MCL 330.1750(2); MSA 14.800(750)(2).]

MCL 600.2157a(2); MSA 27A.2157(1)(2). The House Legislative Analysis, HB 4609, November 16, 1983, indicates a desire to afford victims who consult with counselors at a sexual assault crisis intervention center the same assurance of confidentiality that those who consult with psychologists, psychiatrists, or social workers are afforded. The analysis discusses the role confidentiality plays in effective therapy:

> [Sexual assault] [c]ounselors feel obliged to warn their clients beforehand that communications between them may be used as evidence in court, and they report that this knowledge often has an important chilling effect on the client's willingness to be forthcoming. Crisis intervention centers often make it a practice to keep minimal records in order to protect privacy as much as possible, but this practice makes resumption of counseling after a lapse of time or by another counselor much more difficult. [*Id.*]

The only exception recognized in MCL 600.2157a; MSA 27A.2157(1) is the mandatory disclosure provisions of the Child Protection Act, MCL 722.623(1); MSA 25.248(3)(1).[13]

The statute addressing the social worker-client privilege, MCL 339.1610(1); MSA 18.425(1610)(1) provides in part one that the social worker "shall not be required to disclose a communication" and in part two that communications are confidential. The exceptions to the privilege are disclosures for internal supervision of the social worker, disclosures made under the duty to warn third parties, as set forth in MCL 330.1946; MSA 14.800(946), and where the client has waived the privilege.

The psychologist-patient privilege, MCL 330.1750; MSA 14.800(750), establishes an eviden-

___
[13] See n 3 for text.

tiary privilege in court proceedings unless the patient has waived the privilege. The few exceptions provided by the statute include when the communication is relevant to a condition the patient has introduced as an element of a claim and when a malpractice action is brought against the treating psychologist. The privilege extends not just to the communications made in the course of treatment, but to the fact of treatment as well.

Defendant Stanaway included a request for the juvenile diversion records of the complainant in his discovery motion. The prosecutor asserted that those records were privileged by both the social worker-client privilege and under the Juvenile Diversion Act, MCL 722.828-722.829; MSA 25.243(58)-25.243(59).[14] The juvenile diversion officer in this case was a licensed social worker. Her contract with the juvenile division of the probate court stipulated that she would provide counseling services to juveniles in the diversion program.

The Juvenile Diversion Act[15] mandates the creation of a limited record containing some specific, basic information to document the fact of diversion.[16] An examination of the House Legislative

---

[14] See n 11 for text.

[15] MCL 722.821 et seq.; MSA 25.243(51) et seq.

[16] Specifically, MCL 722.826; MSA 25.243(56) provides:

When a decision is made to divert a minor, the law enforcement official or court intake worker shall file with the court in the county in which the minor resides or is found all of the following information:
(a) The minor's name, address, and date of birth.
(b) The act or offense for which the minor was apprehended.
(c) The date and place of the act or offense for which the minor was apprehended.
(d) The diversion decision made, whether referred or released.
(e) The nature of the minor's compliance with the diversion agreement.

Analysis, HB 4597, December 10, 1987, reveals that the purpose of this recordkeeping requirement was to provide a trail in the event future decisions needed to be made regarding whether or not to place a juvenile in the diversion program.[17]

Records created pursuant to these requirements are accessible by court order if it is determined that the person requesting them has a legitimate interest.[18] However, MCL 722.829; MSA 25.243(59) arguably defines "legitimate interest" in the records as being only for the purpose of considering whether to divert a minor.[19]

We hold that the records required under the act are subject to the privilege established by the act. Any additional records created by the juvenile diversion officer in her capacity as a social worker are protected by the statutory social worker-client privilege. Defendants' need for the records does not fit any of the exceptions afforded under the statutes.

---

[17] [Juvenile diversion] programs should not be used to give "free rides" to youths who do not take their parts under diversion agreements seriously. Consistent recordkeeping on diverted youth would provide information needed by law enforcement and courts in deciding whether diversion is appropriate for a given youngster. [House Legislative Analysis, HB 4597, December 10, 1987.]

[18] We note that the diversion records controlled by MCL 722.828; MSA 25.243(58) relate to those records required to be kept under the Juvenile Diversion Act.

We also note that this issue is moot because the act provides for the destruction of a minor's record within twenty-eight days after the minor's seventeenth birthday. MCL 722.828(3); MSA 25.243(58)(3).

[19] MCL 722.829; MSA 25.243(59) provides:

(1) A record kept under this act shall not be used by any person, including a court official or law enforcement official, for any purpose except in making a decision on whether to divert a minor.

(2) A person who violates this section is guilty of a misdemeanor, punishable by imprisonment for not more than 180 days, or a fine of not more than $1,000.00, or both.

All the privileges cited indicate a legislative intent to create an evidentiary privilege that precludes a defendant's access to confidential communications. Under the clear and unambiguous language used in the statutes, the Legislature intends to preclude defendants from having any access to communications made in these counseling settings. These communications are not intended to be available for use as evidence, either for impeachment or as exculpatory evidence, in a civil or criminal trial.

We agree with the prosecutors' views that these privileges shield the counseling and juvenile diversion records of the complainants.

### B. DUE PROCESS CHALLENGE

We now must consider whether the constitutional rights of the defendants to due process[20] supersede the statutory privileges.

At the heart of this controversy is the defendants' premise that if relevant evidence is shielded by privilege for some purpose other than enhancing the truth-seeking function of a trial, then the danger of convicting an innocent defendant increases. While the duty to provide evidence may involve a sacrifice of privacy, the public has a right to everyone's evidence. 8 Wigmore, Evidence

---

[20] US Const, Am XIV provides in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . .

The Michigan counterpart, Const 1963, art 1, § 17, provides in part:

No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law.

(McNaughton rev), § 2192, pp 70-74. "All that soci-
ety can fairly be expected to concede is that it will
not exact this knowledge when necessity does not
demand it, or when the benefit gained by exacting
it would in general be less valuable than the
disadvantage caused . . . ." *Id.,* p 72. In *United
States v Nixon,* 418 US 683, 710; 94 S Ct 3090; 41
L Ed 2d 1039 (1974), the Supreme Court explained
that "exceptions to the demand for every man's
evidence are not lightly created nor expansively
construed, for they are in derogation of the search
for truth." However, the United States Supreme
Court also held in *Mancusi v Stubbs,* 408 US 204;
92 S Ct 2308; 33 L Ed 2d 293 (1972), that eviden-
tiary limitations may be placed on confrontation
rights to accommodate other legitimate interests
in a criminal trial where prior recorded testimony
was admitted because a witness was unavailable
and the statements bore a sufficient indicia of
reliability.

The nation's highest court has struck down a
Mississippi hearsay rule because, when combined
with that state's voucher rule, the defendant was
prevented from presenting witnesses in his de-
fense. *Chambers v Mississippi,* 410 US 284, 302; 93
S Ct 1038; 35 L Ed 2d 297 (1973). "[T]he . . . rule
may not be applied mechanistically to defeat the
ends of justice," but must meet the fundamental
standards of due process. Evidentiary rules must
be evaluated when applied for a determination
whether the interests served justify the potential
limitation imposed on a defendant's constitutional
rights. *Rock v Arkansas,* 483 US 44, 56; 107 S Ct
2704; 97 L Ed 2d 37 (1987) (in which an eviden-
tiary rule regarding the inadmissibility of post-
hypnotic memories was determined to unconstitu-
tionally limit the accused's due process right to
testify on her own behalf). However, the United

States Supreme Court has vacated and remanded a Michigan Court of Appeals opinion, *People v Lucas,* 160 Mich App 692; 408 NW2d 431 (1987), holding that a ten-day notice rule regarding a criminal defendant's intention to introduce evidence did not violate per se the Sixth Amendment of the federal constitution.[21] *Michigan v Lucas,* 500 US 145; 111 S Ct 1743; 114 L Ed 2d 205 (1991).

A protective order prohibiting cross-examination regarding a witness' juvenile offenses granted pursuant to a similar state statute providing for juvenile records to be kept confidential was struck down in *Davis v Alaska,* 415 US 308; 94 S Ct 1105; 39 L Ed 2d 347 (1974), as violative of the defendant's right of confrontation under the Sixth and Fourteenth Amendments:

> The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness. . . . [T]he State cannot, consistent with the right of confrontation, require the petitioner to bear the full burden of vindicating the State's interest in the secrecy of juvenile criminal records. [*Id.,* p 320.]

The issue in this case is discovery access to information that would be useful at trial for impeachment purposes or useful as exculpatory evidence. "There is no general constitutional right to discovery in a criminal case . . . ." *Weatherford v Bursey,* 429 US 545, 559; 97 S Ct 837; 51 L Ed 2d 30 (1977). The leading United States Supreme Court case on the issue of pretrial access to privi-

---

[21] The Court of Appeals thereafter remanded to the trial court for an in camera hearing to determine whether the notice requirement would violate the defendant's Sixth Amendment rights in light of the evidence. *People v Lucas (On Remand),* 193 Mich App 298; 484 NW2d 685 (1992).

leged counseling records is *Pennsylvania v Ritchie,*
480 US 39, 56; 107 S Ct 989; 94 L Ed 2d 40 (1987).
The defendant in *Ritchie* was charged with crimi-
nal sexual assault of his daughter. He requested
access to the confidential files of the state service
agency charged with investigating child abuse. *Id.,*
p 43. A majority of the United States Supreme
Court held that the in camera procedure ordered
by the trial court satisfied the defendant's federal
constitutional rights. *Id.,* p 61. The Court disagreed
regarding whether the Confrontation Clause com-
pelled pretrial discovery or whether the result was
compelled by a due process analysis. A plurality
held that the right to confrontation is a trial right.
*Id.,* p 54. To the extent that limitations on discov-
ery may infringe on the defendant's right to com-
pulsory process, under the facts of the case before
the Court, that right affords no greater protection
than afforded by due process.[22] *Id.,* p 56.

"Our cases establish, at a minimum, that crimi-
nal defendants have the right to . . . put before a
jury evidence that might influence the determina-
tion of guilt." *Ritchie, supra,* p 56. The Court held
that the defendant's due process interests in seek-
ing favorable evidence would be satisfied by in
camera review. The Court acknowledged that
where an in camera review is conducted, the de-
fendant does not receive the benefit of the advo-
cate's eye, but the Court observed that full disclo-
sure would "sacrifice unnecessarily the Common-

---

[22] Justice Blackmun, writing separately, was of the opinion that the
right of confrontation encompassed the right of effective cross-
examination. This, in his view, may mean a right of pretrial discov-
ery:

   If I were to accept the plurality's effort to divorce confronta-
   tion analysis from any examination into the effectiveness of
   cross-examination, I believe that in some situations the con-
   frontation right would become an empty formality. [*Ritchie,
   supra,* p 62.]

wealth's compelling interest[23] in protecting its child-abuse information." *Id.,* p 60.

Part of the Court's rationale for upholding in camera inspection was the fact that the records were those of a government agency. *Id.,* pp 57-60. Defendants have a due process right to obtain evidence in the possession of the prosecutor if it is favorable to the accused and material to guilt or punishment. *Brady v Maryland,* 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963); *People v Carter,* 415 Mich 558, 593; 330 NW2d 314 (1982). Material has been interpreted to mean exculpatory evidence that would raise a reasonable doubt about the defendant's guilt. *United States v Agurs,* 427 US 97, 104; 96 S Ct 2392; 49 L Ed 2d 342 (1976). The prosecution must turn over such evidence regardless of whether the defendant makes a request. *Id.* The defendant in *Ritchie* had been convicted in the trial court without agency records having been furnished. *Ritchie, supra,* p 57. The in camera inspection was to determine whether the investigatory records contained exculpatory material that should have been provided to him. *Id.,* p 58. The test for whether the material should have been provided to him is "whether it contains information that probably would have changed the outcome of his trial." If there was no such material or if the nondisclosure was harmless beyond a reasonable doubt, then, the Court held, the conviction could be reinstated. In a footnote, the Court indicates that "Ritchie, of course, may not require the trial court to search through the CYS [Children and Youth Services] file without first establishing a

23 The risk that a trial court might not recognize exculpatory evidence does not justify thwarting the state's commendable effort to assure confidentiality of child abuse records in the wake of the difficulty of detection and prosecution and the unwillingness of victims and witnesses to come forward. *Ritchie, supra,* pp 60-61.

basis for his claim that it contains material evidence." *Id.,* p 58, n 15.

Our remand of *Stanaway* has established that the prosecutor has not at any time had access to the records requested by the defendant. Nor were these "investigative" records of a governmental agency. The disclosure requirements of *Brady, supra,* are directly applicable where the prosecutor possesses the record. *People v Reed,* 393 Mich 342, 353; 224 NW2d 867 (1975); *People v Dellabonda,* 265 Mich 486, 500-501; 251 NW 594 (1933). An in camera review would be appropriate to determine whether the prosecutor withheld any evidence he was duty-bound to disclose.[24] That is not the situation in the cases we are considering today.

The *Ritchie* Court also noted that the privilege regarding the investigatory files was "qualified" in that the Pennsylvania statute[25] contemplated some use of the files in judiciary proceedings. The Court explicitly stated: "[w]e express no opinion on whether the result in this case would have been different if the statute had protected the CYS files from disclosure to anyone, including law-enforcement and judicial personnel." *Id.,* p 57, n 14.

Other than the very limited use in deciding whether a juvenile is a likely candidate for diversion, the privilege statutes this Court is asked to apply today do not contemplate use in judicial proceedings. As such, our statutes do not create the qualified privilege the United States Supreme

[24] See, e.g., *Kirby v State,* 581 So 2d 1136 (Ala, 1990) (in camera examination was ordered for those psychiatric records the prosecutor had knowledge of).

But see *State v Little,* 260 Mont 460; 861 P2d 154 (1993) (there is no access to counseling records if the prosecutor does not use them).

[25] 23 Pa Cons Stat Ann 6340(a)(5).

Court addressed in *Ritchie*.[26] We do not believe it generally is necessary to delve into the subtle distinctions between the various privileges asserted in this case.[27] While the aforementioned privileges arguably consist of gradations, we believe none are the equivalent of the qualified privilege interpreted by the Supreme Court. The Supreme Court definition of qualified privileges in *Ritchie* contemplates some use of the file in judicial proceedings. *Id.,* p 58.

Absolute privileges—privileges providing that information is not to be disclosed to anyone—have been abrogated despite the existence of the government's privilege to withhold disclosure of the identity of an informant where disclosure was compelled to satisfy the defendant's Sixth Amendment confrontation rights. *Roviaro v United States,* 353 US 53; 77 S Ct 623; 1 L Ed 2d 639 (1957); *People v Poindexter,* 90 Mich App 599; 282 NW2d 411 (1979). "[N]o fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro, supra,* p 62.

Common-law and statutory privileges may have

[26] The unqualified statutory privilege for communications between sexual assault counselors and victims, 42 Pa Cons Stat Ann 5945.1(b), was specifically cited by the Court as the privilege it was not addressing. *Ritchie, supra,* p 57 and n 14.

The Rhode Island Supreme Court has ruled that the creation of an absolute evidentiary privilege would violate the constitutional rights of the defendant to confrontation and compulsory process. *Advisory Opinion to the House of Representatives,* 469 A2d 1161 (RI, 1983).

[27] The consideration of all the statutory privileges examined today under the "plausible showing of materiality" test, as suggested by the separate opinion, would not sufficiently balance the state's important and legitimate interest in protecting the confidentiality evidenced by the establishment of the privileges. Such a position ignores the distinction between the privileges presently before this Court and the privilege contained in the Pennsylvania statute construed by the *Ritchie* Court. The position ignores the harm in camera review in and of itself does to the privileged relationship.

to be narrowed or yielded if those privileges inter-
fere with certain constitutional rights of defen-
dants. See, e.g., *Davis, Ritchie, Roviaro, Lucas,* and
*Nixon, supra* (even the executive privilege afforded
the president must yield to due process demands
in the administration of criminal justice); *People v
Adamski,* 198 Mich App 133; 497 NW2d 546 (1993);
*Howe v Detroit Free Press, supra* (the statutory
privilege precluding access to probation reports
must yield where it conflicts with certain constitu-
tional rights); *People v Bellanca,* 386 Mich 708;
194 NW2d 863 (1972) (despite the need for secrecy,
the defendant has a right to a grand jury tran-
script in order to be prepared for cross-
examination of the witnesses); *Davis v Lhim,* 124
Mich App 291; 335 NW2d 481 (1983) (endorsing
the reasoning of *Tarasoff v Regents of Univ of
California,* 17 Cal 3d 425; 131 Cal Rptr 14; 551 P2d
334 [1976], in finding that psychiatrists have a
duty to warn third parties of the danger a patient
may pose where threats have been made); *People v
Mobley,* 390 Mich 57; 210 NW2d 327 (1973) (a
codefendant who takes the stand against a defen-
dant cannot claim the privilege against self-
incrimination and avoid having his testimony and
credibility tested by cross-examination); *People v
Hunter,* 374 Mich 129; 132 NW2d 95 (1965) (if the
prosecution submits medical proof in a rape case,
the submission operates as an admission that
there will not be an assertion of any privilege
when rebuttal medical testimony is offered); *In re
Baby X,* 97 Mich App 111; 293 NW2d 736 (1980) (a
parent's right to confidentiality in drug treatment
records must yield if a court determines that the
records are necessary and material to the state's
proof of neglect in a child neglect proceeding);
*People v Walton,* 71 Mich App 478; 247 NW2d 378
(1976) (confidential statements made to the police

by witnesses should be inspected in camera to determine whether fundamental fairness requires that the defendant have access to the information in order to prepare his defense).

Where other jurisdictions have specifically addressed the validity of counseling privileges, most have attempted to balance the defendant's constitutional right to a fair trial with the complainant's interest in confidential therapy. Many require the defendant to make a preliminary showing that the privileged information is likely to contain evidence useful to his defense.[28] Once such a showing is

---

[28] See, e.g., *Arizona ex rel Romley v Superior Court, Maricopa Co,* 172 Ariz 232; 836 P2d 445 (1992) (where a state constitutional right afforded to the victim conflicts with the defendant's due process right to present a defense, the victim's right to refuse discovery must yield if the defendant makes a sufficient showing of need); *People v Turley,* 870 P2d 498 (Colo App, 1993) (the defendant failed to make a sufficient preliminary showing to warrant in camera review when he alleged that the victim's mental health records were related to her general credibility and reliability); *People v Exline,* 775 P2d 48 (Colo App, 1988) (the defendant's request for anything in the reports that relates to credibility is not the specific preliminary showing sufficient to warrant in camera review of counseling records); *State v Joyner,* 225 Conn 450; 625 A2d 791 (1993) (in camera inspection of psychiatric and substance abuse records is proper where the defendant failed to offer any evidence likely to establish a reasonable connection between the victim's alleged alcohol abuse and testimonial reliability); *People v McMillan,* 239 Ill App 3d 467; 607 NE2d 585 (1993) (the defendant failed to show that the psychiatric records of his codefendant were sufficiently relevant to overcome the privilege); *Louisiana v Ortiz,* 573 So 2d 531 (La App, 1991) (in camera review of psychological records met due process requirements); *Zaal v State,* 326 Md 54; 602 A2d 1247 (1992) (review of a victim's school records protects both the interest of the state and the rights of the accused); *Baltimore Dep't of Social Services v Stein,* 328 Md 1; 612 A2d 880 (1992); *State v Hummel,* 483 NW2d 68 (Minn, 1992) (a defendant is not entitled to in camera review of a murder victim's psychiatric records absent a showing of how the file could likely be related to the defense); *State v Morgan,* 477 NW2d 527 (Minn App, 1991) (relevance and materiality of confidential medical documents is determined by in camera review); *State v Cressey,* 137 NH 402; 628 A2d 696 (1993) (in camera review of a psychologist's counseling notes is necessary if the defendant establishes a reasonable probability that the notes contain information relevant and material to the defense); *State v Ramos,* 115 NM 718; 858 P2d 94 (1993) (the defendant must show there is some information in the psychiatric records of a witness that suggests a mental

demonstrated, the privilege must yield to the defendant's constitutional rights.[29]   An   in   camera

disorganization affecting credibility in order to have access); *People v Arnold*, 177 AD2d 633; 576 NYS2d 339 (1991) (if a defendant requests the psychiatric reports of a witness, the proper procedure is to conduct an in camera review after the defendant shows the records might contain material "bearing on the reliability and accuracy of the witness' testimony"); *State v Middlebrooks*, 840 SW2d 317 (Tenn, 1992) (because the psychiatric records of a witness were relevant in determining veracity, the trial court should have conducted an in camera inspection); *State v Kalakosky*, 121 Wash 2d 525; 852 P2d 1064 (1993) (a defendant must make a showing of need for review of the counseling records of a victim that is greater than an allegation that the records might contain inconsistent statements); *Gale v State*, 792 P2d 570 (Wy, 1990) (in camera review for constitutionally material evidence was not an abuse of discretion).

[29] The following are examples of how other jurisdictions have balanced the defendant's constitutional rights with other privileges: *Coats v State*, 615 So 2d 1260 (Ala App, 1993) (in camera review of Department of Human Resources file for *Brady* exculpatory information); *Duncan v State*, 587 So 2d 1260 (Ala App, 1991) (once an undercover officer testifies for the government, the defendant is entitled to at least an in camera inspection of his report); *State v March*, 859 P2d 714, 717 (Alas App, 1993) (a threshold showing of admissibility to entitle a defendant to in camera access to a confidential personnel file fails to safeguard a criminal defendant's due process right to discovery of exculpatory information); *State v Harris*, 227 Conn 751; 631 A2d 309 (1993) (in camera review of personnel files for *Brady* exculpatory evidence satisfies defendant's due process rights; examination for impeachment evidence should be conducted if the defendant establishes a reasonable ground to believe the failure to produce the records would likely impair his defense); *State v Hubbard*, 32 Conn App 178; 628 A2d 626 (1993) (in camera inspection of police records was properly denied where the defendant failed to demonstrate a reasonable likelihood that the records would contain information relevant to his case); *Carter v United States*, 614 A2d 913 (DC App, 1992) (denial of an in camera hearing regarding the location of a police observation post was proper where the defendant's generalized need to know did not outweigh the government's interest in maintaining confidentiality); *Dep't of Health & Rehabilitative Services v Lopez*, 604 So 2d 11 (Fla App, 1992) (agency records must be inspected in camera for *Brady* violation); *Stewart v State*, 210 Ga App 474; 436 SE2d 679 (1993) (in camera review of children's services file, including videotaped interview with the victim, for exculpatory material satisfies *Brady*); *Anderson v State*, 200 Ga App 29; 406 SE2d 791 (1991) (in camera review of prosecutor's file is not necessary if the defendant did not identify the materiality or favorable nature of the evidence sought); *Stripling v State*, 261 Ga 1; 401 SE2d 500 (1991) (in camera inspection of parole records met due process requirements); *State v SP*, 608 So 2d 232 (La App, 1992) (in camera inspection of juvenile records must be conducted if defense counsel makes a request

for specific, relevant evidence); *State v Jackson,* 608 So 2d 949 (La App, 1992) (in camera inspection of a prosecutor's file to determine if exculpatory material should have been disclosed); *State v Hutchinson,* 597 A2d 1344 (Me, 1991) (in camera review of Department of Human Services records for exculpatory information satisfies due process); *Reynolds v State,* 98 Md App 348; 633 A2d 455 (1993) (in camera review and production of hospital records require more than the fact that the complainant took the witness stand); *State v Goodwin,* 249 Mont 1; 813 P2d 953 (1991) (information determined to be relevant and necessary to the defense should be forwarded to the defendant if discovered during an in camera inspection of family services files); *State v Dedrick,* 135 NH 502; 607 A2d 127 (1992) (denial of review in camera of the prosecutor's notes was proper where the defendant did not show the prosecutor withheld evidence); *State v Baker,* 112 NC App 410; 435 SE2d 812 (1993) (it was error for the trial court to refuse to conduct review in camera of the witness' statements in the possession of the prosecutor); *People v Ellis,* 188 AD2d 1043; 592 NYS2d 200 (1992) (in camera review of the prosecutor's file revealed *Brady* violations); *People v Monroe,* 186 AD2d 93; 588 NYS2d 547 (1991) (in camera review of personnel files for information that is relevant to impeachment of witness credibility); *People v Gallardo,* 173 AD2d 636; 570 NYS2d 222 (1991) (defendant is entitled to in camera inspection of the prosecutor's notes if he can articulate a factual basis supporting his need for the information); *State v Black,* 85 Ohio App 3d 771; 621 NE2d 484 (1993) (conducting in camera inspection of confidential educational records rather than allowing the defendant direct access is not an abuse of discretion); *State v Wadsworth,* 86 Ohio App 3d 666; 621 NE2d 773 (1993) (in camera inspection is not required when the defendant failed to make a proper challenge to the prosecutor's claim that the requested sheriff's records were work product); *Chillicothe v Knight,* 75 Ohio App 3d 544; 599 NE2d 871 (1992) (where the plaintiff failed to assert facts to establish materiality, trial court was under no obligation to conduct review of police "use of force" records); *Amos v Dist Court of Mayes Co,* 814 P2d 502, 503 (Okla App, 1991) (the trial court must conduct an in camera examination of the Oklahoma State Bureau of Investigation file even though they are privileged by statute because "[e]xculpatory evidence is always available to a defendant and statutory provisions cannot deny access"); *State ex rel Dugan v Tiktin,* 313 Or 607; 837 P2d 959 (1992) (a judge may not delegate statutory duty to examine a children's services division file upon a showing of good cause for disclosure); *State v Leslie,* 119 Or App 249; 850 P2d 1134 (1993) (in camera examination of personnel files appropriately balances the interests); *State v Pena,* 108 Or App 171; 813 P2d 1134 (1991) (*Brady* exculpatory standard applied to eye witness records); *State v Christopherson,* 482 NW2d 298 (SD, 1992) (the failure by the trial court to disclose confidential juvenile records after an in camera examination was not error because the records did not contain relevant information); *Crawford v State,* 863 SW2d 152, 165 (Tex App, 1993) (the defendant is entitled to in camera review of confidential "Crime Stoppers" report to determine if *Brady* information is contained therein); *Washington v State,* 856 SW2d 184 (Tex Crim App, 1993) (when a work product privilege is

inspection of the privileged records is conducted. For example, the New Hampshire Supreme Court has ruled that due process requires access to privileged medical and psychological records by way of an in camera inspection if the defendant establishes a reasonable probability that the records contain information that is material and relevant to his defense. *State v Gagne,* 136 NH 101; 612 A2d 899 (1992).

Illinois and Pennsylvania both have refused to disclose records where the statutory privilege was determined to be absolute. *People v Foggy,* 121 Ill 2d 337; 521 NE2d 86 (1988); *Commonwealth v Wilson,* 529 Pa 268, 278; 602 A2d 1290 (1992); *Commonwealth v Kennedy,* 413 Pa Super 95; 604 A2d 1036 (1992). In *Foggy,* the court gave two reasons for denying the defendant's request. The first was support for the strong public policy against disclosure underlying the privilege. The second was the fact that the defendant had failed to show that the files contained relevant information that might exculpate or be useful to impeach. Under the facts of *Foggy,* the request was merely for inconsistent statements because, in the words of the defendant, the trial would amount to a credibility contest. The court stated that if it were to be held that the defendant had established a sufficient showing that the records likely contained relevant information on the basis that this case

claimed, the defendant is entitled to in camera review of documents for a determination of whether they are discoverable).

But cf. *DeFries v State,* 597 So 2d 742 (Ala App, 1992) (in a jurisdiction that retains a prohibition against impeaching one's own witness, the defendant was not entitled to an in camera inspection of the police report where the officer who prepared the report was called as a defense witness); *State v Little,* n 24 *supra* (*Ritchie* applies to access to Department of Family Services files but not to psychological records); *Commonwealth v Kennedy,* 413 Pa Super 95; 604 A2d 1036 (1992) (where the statute establishes that the protective service file is to be absolutely privileged, in camera review is not allowed).

amounted to a credibility contest, then the privilege would be abrogated in virtually every case. *Id.,* p 350.

The Pennsylvania appellate courts have also held that in camera review violates the absolute privilege established by the state legislature.[30] *Wilson* and *Kennedy, supra.* The Pennsylvania Supreme Court interpreted *Ritchie* as inapplicable when the privilege is absolute. *Wilson,* pp 280-281. The Pennsylvania Court of Appeals held *Ritchie* applies only to cases in which the records are in the possession of the prosecution. *Kennedy,* p 114. " 'Subjecting the confidential file to *in camera* review by the trial court (as well as the appellate courts and staff members) would jeopardize the treatment process and undermine the public interests supporting the privilege. Simply stated, an absolute privilege of this type and in these circumstances requires absolute confidentiality.' " *Id.,* pp 115-116, quoting *Commonwealth v Kyle,* 367 Pa Super 484, 505; 533 A2d 120 (1987).

The concurring opinion in *Kennedy* expressed concern that it was unconstitutional to hold a statutory privilege superior to a defendant's rights of due process. It is the "state's compelling interest in the confidentiality of the counseling relationship [that] must yield to the greater interest in promoting and protecting the defendant's constitutional rights." *Id.,* p 119. Constitutional protections for the accused should not be sacrificed by way of

___

[30] 42 Pa Cons Stat Ann 5945.1(b)(1) provides:

(b) Privilege—
(1) No sexual assault counselor may, without the written consent of the victim, disclose the victim's confidential oral or written communications to the counselor nor consent to be examined in any court or criminal proceeding.

a rule of nondisclosure per se as a sympathetic response to the physical and emotional trauma suffered by victims. " 'The Constitution of this Commonwealth is the absolute—a legislative enactment of a statutory privilege is not.' " *Id.,* quoting *Commonwealth v Wilson, supra,* p 286.

Not only is judicial in camera review of privileged material possible in certain situations, the Massachusetts Supreme Court has attempted to include the so-called "eye of the advocate" in its review of privileged documents. *Commonwealth v Stockhammer,* 409 Mass 867, 882-883; 570 NE2d 992 (1991). The procedure involves a multistep inquiry. In order to receive an in camera inspection, a defendant must advance a good-faith belief, having some factual basis, that the privileged records are likely to be relevant to an issue in the case. The judge will then conduct an in camera review of the records. *Commonwealth v Bishop,* 417 Mass 169; 617 NW2d 990 (1993). If upon inspection, the trial judge finds the records in fact to be relevant, he will then allow defense counsel access to those records to determine whether disclosure of the relevant communications is necessary for a fair trial. *Id.,* pp 179-180. "[F]ull disclosure, predicated solely on a defendant's uninformed request may yield nothing for the defense, and the privilege would have been pierced unnecessarily." *Id.,* p 177.

In *State v Shiffra,* 175 Wis 2d 600; 499 NW2d 719 (1993), the prosecutor provided a defendant accused of sexual assault with information that indicated the complainant had a history of psychiatric problems that might affect her credibility. On the basis of this information, the defendant moved for an in camera inspection of the complainant's past mental health records. Applying Wisconsin

Court of Appeals precedent,[31] the trial court ruled that the defendant had provided a sufficient basis for an in camera inspection to determine if the records contained evidence that would be material to the defendant.[32] The complainant refused to waive her statutory privilege.[33] The Wisconsin Court of Appeals affirmed the order issued by the trial court barring the witness from testifying at trial, stating that no other sanction was appropriate because the witness had no obligation to waive her privilege to the records.[34] *Id.,* pp 611-612.

The numerous writings that contributed to the plurality *Ritchie* holding and the factors discussed, but not resolved therein, make it difficult to divine a precise formula for balancing against a defendant's due process rights the state's pronounced interest in its evidentiary counseling privileges that enhance the healing process in the wake of abuse.[35] However, our review of the jurisprudence

[31] The Wisconsin Court of Appeals had held previously that *Pennsylvania v Ritchie, supra,* is applicable even when the information is not in the possession of the state but is in the possession of a private counseling agency as long as it is shielded by statutory privilege. *State v SH,* 159 Wis 2d 730; 465 NW2d 238 (1990); *In re KKC,* 143 Wis 2d 508; 422 NW2d 142 (1988).

[32] The court analogized to cases in which the informant privilege has been abrogated by the defendant's due process right to a fair determination of guilt.

See *Roviaro v United States, supra* (the public interest in protecting the confidentiality of an informant must give way if a defendant can demonstrate that disclosure would be relevant and helpful to his defense or essential for a fair determination of a cause); *State v Outlaw,* 108 Wis 2d 112; 321 NW2d 145 (1982).

[33] Wis Stat Ann 905.04.

[34] Similarly, the Illinois Supreme Court has ruled that in the event that a complainant refuses to allow a defendant's expert to conduct an examination, the prosecutor is precluded from offering rape trauma syndrome evidence to establish the defendant's guilt. *People v Wheeler,* 151 Ill 2d 298; 602 NE2d 826 (1992).

[35] Hogan, *The constitutionality of an absolute privilege for rape crisis counseling: A criminal defendant's sixth amendment rights versus a rape victim's right to confidential therapeutic counseling,* 30 BC L R 411, 413 (1989) (the testimonial privilege for communications

of other states, along with our own precedent in dealing with discovery and evidentiary principles, coupled with a prudent need to resolve doubts in favor of constitutionality, prompts us to hold that in an appropriate case there should be available the option of an in camera inspection by the trial judge of the privileged record on a showing that the defendant has a good-faith belief, grounded on some demonstrable fact, that there is a reasonable probability that the records are likely to contain material information necessary to the defense.

We reject the novel approach fashioned by the separate opinion that would place before the trial court the additional inquiry regarding how important the absolute privilege in question is to the particular privilege holder.[36] This suggested inquiry into the variable weight of the privilege depending on the sensitivity of the privilege holder would be both unprecedented and unworkable.[37] It

between a rape victim and her counselor promotes the important social goals of rehabilitation of the victim and prosecution of the rapist).

[36] After the defendant has made a plausible showing of materiality, "the prosecutor, representing the interests of the privilege holder, and the defendant should present their respective arguments regarding the effect disclosure would have on the goals of the privilege." *Post*, p 719.

[37] Under this fluctuating standard, the trial court would be asked to conduct an individualized assessment of the importance of the statutory privilege to the particular privilege holder. How is a judge to determine how grave an injury disclosure of records will cause a particular privilege holder without knowing, at least in a partial sense, what the records contain? How can a prosecutor represent the particularized importance of the privilege without knowing what the records contain? The partial disclosure necessary in many cases to establish the privilege holder's need for the noninspection of the records would be more intrusive than the in camera inspection.

As will be the case in many instances, where the accuser is the privilege holder, it would seem that the more unstable the accuser, the greater the likelihood abrogation of the privilege would be deemed harmful. Correlating with the accuser's instability, however, will be the greater need for the defendant to access mental health records to prove that the accusation arises from instability rather than reality. Where a statute seeking to protect a victim clashes with

is not even remotely suggested by the Supreme Court in *Ritchie.*

The creation of the various privileges discussed in this opinion establishes the Legislature's assumption that any forced disclosure of the information protected will cause injury to the privilege holder. The weight of the privilege or the need for the privilege is relevant to and is incorporated into the balancing test this Court articulates today. The test we adopt today anticipates that the privilege holder would be better off if the privilege remains intact.[38]

We believe we are upholding the general purposes of the statutory privileges to prevent the routine disclosures that would undermine therapeutic relationships. We must recognize, however, that in *certain* circumstances an in camera review of the records is necessary so as not to undermine confidence in the outcome of a trial. In camera inspection of privileged information by the court is a "useful intermediate step between full disclosure and total nondisclosure." *United States v Gambino,* 741 F Supp 412, 414 (SD NY, 1990); *People v Hackett,* 421 Mich 338; 365 NW2d 120 (1984).

Where the defendant has made the required showing, in camera inspection of privileged documents by the judge strikes the delicate balance between the defendant's federal and state constitu-

---

the defendant's federal and state constitutional rights, the statute must yield. It should be remembered that the legal status of an accuser as victim does not obtain until a conviction is entered.

[38] The suggestion in the separate opinion that a less stringent test for abrogation of all privileges in which the Legislature had not used waiver language is difficult to accept given this Court's recognition of evidentiary privilege in the courtroom where less than an absolute privilege was established. *Howe v Detroit Free Press, supra.* The test suggested by the separate opinion could unnecessarily burden trial courts with the need to conduct more in camera inspections under its "plausible showing of materiality test" and undermine the legislative purposes in establishing the statutory privileges in question.

tional rights to discover exculpatory evidence
shielded by privilege, and the Legislature's inter-
est in protecting the confidentiality of the thera-
peutic setting.[39] Only after the court has conducted
the in camera inspection and is satisfied that the
records reveal evidence necessary to the defense is
the evidence to be supplied to defense counsel.[40]
We are confident that trial judges will be able to
recognize such evidence. The presence of defense
counsel at such an inspection is not essential to
protect the defendant's constitutional rights and
would undermine the privilege unnecessarily.

The state's interest in preserving the confiden-
tiality of the social worker, diversion, and rape-

[39] Far from overvaluing and underappreciating the privileges at
issue, as the separate opinion accuses, see *post,* p 701, today's opinion
is narrowly tailored to preserve the privileges to the extent permissi-
ble under the federal and state constitutions.

[40] The separate opinion also suggests that a new and different
inquiry be conducted when the judge is trying to decide whether to
turn over any or all of the file in the course of conducting the in
camera inspection. We believe the basic inquiry that determined
whether to conduct the inspection controls the decision whether to
give information to the defendant. The separate opinion mischaracter-
izes as identical our tests for whether to grant an in camera inspec-
tion and whether to disclose the documents to the defendant. The
inquiry is similar, but not identical. The initial threshold is whether
there is a reasonable probability, that material information necessary
to the defense is likely to be in the record. The determination to be
made after looking at the record is whether the evidence is material
and necessary to the defense, with material meaning exculpatory
evidence capable of raising a reasonable doubt about the defendant's
guilt.

The separate opinion would unnecessarily overcomplicate this deci-
sion by requiring the trial court to determine 1) the policy base for
the privilege at issue, 2) the significance of the privileged information
in a given case, 3) assess the effect the privilege has on the defen-
dant's right to effective cross-examination or theory of defense, and 4)
determine whether there are available alternative means to obtain
the substantial equivalent of the privileged information.

We simply ask the trial court to decide whether the evidence
suspected of being contained in the records was in fact there. The
weighing of the legislative purpose in creating the various privileges
presented by this case has been done today by this Court. There is no
need for any further assessment by the trial court because the
importance of the privilege is accounted for in the tests for in camera
review and disclosure we announce today.

counseling records must yield to a criminal defendant's due process right to a fair trial when the defendant can show that those records are likely to contain information necessary to his defense.

C

We now turn to the application of the test enunciated to the specific facts and circumstances of the cases before us. It was not an abuse of discretion to find the counseling communications protected by the privileges in *Stanaway* or discoverable in *Caruso.*

Criminal defendants do not have general rights to discovery. MCR 6.001. Discovery in criminal cases, however, is left to the discretion of the trial court:

> Discovery will be ordered in criminal cases, when, in the sound discretion of the trial judge, the thing to be inspected is admissible in evidence and a failure of justice may result from its suppression. The burden of showing the trial court facts indicating that such information is necessary to a preparation of its defense and in the interests of a fair trial, and not simply a part of a fishing expedition, rests upon the moving party. [*People v Maranian,* 359 Mich 361, 368; 102 NW2d 568 (1960).]

In general, when a discovery request is made disclosure should not occur when the record reflects that the party seeking disclosure is on "a fishing expedition to see what may turn up." *Bowman Dairy Co v United States,* 341 US 214, 221; 71 S Ct 675; 95 L Ed 879 (1951).

In camera inspection is often utilized to determine whether evidence sought is discoverable. The Legislature has expressly provided for this proce-

dure in the context of evaluating a defendant's
proposed use of evidence generally inadmissible
under the rape shield statute. MCL 750.520j(2);
MSA 28.788(10)(2). The in camera hearing pro-
motes the state's interest in protecting the privacy
interests of the alleged victim, while safeguarding
the defendant's right to a fair trial. *People v
Hackett, supra,* p 350.

Defendant Stanaway asserts that the records
sought were necessary to his attempt to unearth
any prior inconsistent statements made by the
complainant or any other relevant rebuttal evi-
dence. This is no more than a generalized asser-
tion that the counseling records may contain evi-
dence useful for impeachment on cross-examina-
tion.[41] This need might exist in every case involv-
ing an accusation of criminal sexual conduct. De-
fendant Stanaway has not stated any specific arti-
culable fact that would indicate that the requested
confidential communications were necessary to a
preparation of his defense. He has not stated a
good-faith basis for believing that such statements
were ever made or what the content might be and
how it would favorably affect his case. The defen-
dant merely alleged that the records may contain
prior inconsistent statements. The defendant over-
states his case when he asserts that his right to
discovery, confrontation, and effective cross-exami-
nation compels that he be granted an opportunity
to discover any potentially exculpatory evidence.
Without a more specific request, defendant is fish-
ing. The request falls short of the specific justifica-

---

[41] Counsel for defendant Stanaway asserted the counseling records
would be exculpatory if they revealed that the complainant had
opportunities to confide regarding the alleged sexual incidents, but
was silent. We reject this asserted need for negative evidence. Silence
in this circumstance would not prove that the offense did not occur.
*State v Scheffelman,* 250 Mont 334; 820 P2d 1293 (1991) (the absence
of rape trauma symptoms during psychological counseling does not
logically prove that a sexual assault did not occur).

tion necessary to overcome the privilege.[42] The trial court did not abuse its discretion in refusing to order an in camera inspection.

Defendant Caruso may have demonstrated a realistic and substantial possibility that the material he requested might contain information necessary to his defense. The defendant argued in his motion for in camera discovery that the circumstances in which the accusation was made were relevant to the truth or falsity of the claim. The defense theory is that the claimant is a troubled, maladjusted child whose past trauma has caused her to make a false accusation against her uncle. The defendant asserted a good-faith belief in his motion that the complainant suffered sexual abuse by her biological father before this allegation of abuse, the nonresolution of which produced a false accusation,[43] and factual support for some sexually aggressive behavior, namely, writing a letter to her mother's live-in boyfriend inviting him to have

[42] While defendant Stanaway is denied access to possible prior inconsistent statements made in the counseling context, we note, as we did in *People v LaLone,* n 1 *supra,* that statements made to a counselor are not the only avenue that was available for exploration regarding the complainant's credibility. The wide world of possible prior inconsistent statements made in nonprivileged communications remains open to him.

[43] We are fully cognizant that under the rape shield statute, MCL 750.520j(1); MSA 28.788(10)(1), evidence of past sexual conduct with others is generally legally irrelevant. *People v Arenda,* 416 Mich 1; 330 NW2d 814 (1982). Any request for the alleged victim's privileged records for the purpose of proving past sexual conduct would not be a request for information material to the defense.

The defendant never suggests that the incident from which the accusation arises was committed by the child's biological father or that the act was consensual. The defense theory in this case is that the act did not happen. The theory is that this is a false accusation that is the product of unresolved trauma inflicted by the biological father. This Court has recognized that while prior sexual conduct may be declared irrelevant to prove consent or to generally impeach, it may be properly admitted for other purposes such as to show bias, motive for false charge, or fact of prior false accusations. *People v Hackett,* 421 Mich 338, 348; 365 NW2d 120 (1984).

sex with her in his car.[44] The in camera review ordered by the trial judge may have been proper under the facts of this case. Because the record is not altogether clear regarding the grounds for ordering the in camera inspection,[45] we remand to the trial court for further proceedings consistent with this holding.[46]

Should the defendant prevail on rehearing, a waiver of the privilege should be requested of the complainant because the privilege in question in *Caruso* is an absolute privilege.[47] We are not relying on an implied waiver analysis to overcome the absolute privileges in question. *Howe v Detroit Free Press, supra,* correctly finds implied waiver

[44] We cannot agree with the suggestion by the separate opinion that further evidence of the existence of the note or production of the note itself if contained in counseling files would be unnecessary because it is cumulative. Cumulative evidence can be probative. While it is true that there was testimony. by one witness that he was present when the eight-year-old child presented the note to her mother's boyfriend, the mother's boyfriend refuted that testimony. At the preliminary examination, he testified that he couldn't really remember what the note said. He characterized it as innocent kid stuff.

[45] It is possible that the judge granted the in camera inspection on the facts established at the preliminary examination that would support the preliminary showing required of defendants as enunciated in this opinion. It is also possible that the inspection was improperly ordered to look for impeachment material in general.

[46] Interestingly, the separate opinion would adopt a supposedly more permissive, "plausible showing of materiality" test for criminal defendants, but would not recognize its test as having been met by defendant Caruso on the basis of the facts presented. Yet, under our stricter test requiring a reasonable probability that the records are likely to contain material information necessary to the defense, we would uphold the ordering of an in camera review on these facts as being properly within the judge's discretion.

[47] See n 12 for the text of the psychiatrist-patient privilege, MCL 330.1750; MSA 14.800(750). Although, not presented by defendant Caruso's motion, we would hold that nonabsolute privileges, meaning privileges that do not specify express waiver, would not require waiver by the privilege holder before an order to produce the documents in question for in camera inspection could be entered. Where the defendant is successful in demonstrating a reasonable probability that material information necessary to confront the evidence against him or necessary to present his theory of defense, his federal and state due process rights outweigh the evidentiary privilege.

when the plaintiff in a defamation suit invokes MCL 791.229; MSA 28.2299 in an attempt to shield evidence that might establish the truth of the publication. The privilege in this case cannot be said to be the prosecutor's to waive. The Legislature has expressly provided that in the case of psychologists and psychiatrists, the privilege must be expressly waived by the privilege holder. The fact of prosecution cannot be said to impliedly waive the privilege. Where it cannot be said that the privilege holder placed mental state in controversy, implied waiver analysis is inappropriate. Our ruling is that where the privilege is absolute if the complainant will not waive her statutory privilege and allow the in camera inspection after the defendant's motion has been granted, suppression of the complainant's testimony is the appropriate sanction.[48]

Only if the in camera inspection reveals information essential and reasonably necessary to the defense should it be provided to the defendant.[49]

### III

Defendant Stanaway asserts that prosecutorial misconduct occurred during closing arguments to the jury. The defendant further asserts that his trial counsel was ineffective in his failure to object.

[48] Where the statutory privilege is not absolute, express waiver is not required. ·

[49] Harmless error analysis has been applied for review of the trial court's improper denial of in camera access. See *State v Morgan,* n 28 *supra* (an independent review of material examined by the trial judge and withheld from the defendant revealed that the denial was proper because the evidence simply restated that which was presented to the jury by other means); *State v Middlebrooks,* n 28 *supra* (the failure by the trial court in not conducting an in camera inspection of psychiatric records was harmless error because inspection by the court of appeals revealed that the records did not contain information probative of witness credibility).

Specifically, the defendant objects to the following statements made by the prosecutor:

> Now, who has [the victim] told this incident to? Well, number one, she told the juvenile counselor; number two, she told her girlfriend; she told her sister; she told the Community Mental Health counselor; she told the prosecutor that works in our office, who handled the preliminary hearing; she told the Judge at the preliminary hearing; she told me; and then she told Kathy O'Day, the counselor, the other counselor; and then the jury. Running out of fingers here, that's nine people she told.
>
> If she were lying, do you think she would go to this great length, and that she would expose herself to this type of process to tell nine different people, nine different times about these incidents? No, she wouldn't do that. She would just say forget it, it's not true. I am not going through with this, it's not worth the hassle. But, unfortunately, you are seeing what happens to this victim, when she does come forward and tells what happened to her. She goes through this type of process.
>
> *    *    *
>
> Her story is the same, it has never really changed, it's always been the same. And she has been through it so many times in her mind, and she has told so many people about it, from the counselors all the way through the criminal system, she hasn't been shaken on it yet, and he didn't shake her on the stand when she testified.

The defendant's position is that the effect of the prosecutor's words were to advise the jury that the complainant's privileged statements to various counselors regarding the charged offenses had remained consistent on the numerous occasions on which the incidents were reported. Although the complainant testified about the fact of counseling, she did not reveal any statements actually made

during counseling. Defendant believes the inference created for the jury was that the prosecutor had been given access to the communications and vouched for their consistency.

Further support for defendant's theory is found in two questions to the court by the jury during deliberations:

> *The Court:* Okay. You can be seated, Members of the Jury. Court is in session. The record should reflect that the jury sent out a question, and I have talked about it with counsel.
>
> And actually, there are two questions. First, *"Why was there no testimony proving the plaintiff did talk to counselors?"* The attorneys and I are agreed that there was testimony from [the complainant] that she had talked to counselors. It was some number of months after the charged events took place, but both attorneys alluded to that fact in their closing arguments, and it seems to be well established that she did in fact talk to various counselors.
>
> And the second question is, *"Is that admissible testimony?"* Well, the fact that she talked to counselors is admissible, but the content of the conversation with the counselors is not admissible. So we can't get into that. [Emphasis added.]

We note at the outset that the prosecutor either was impermissibly arguing facts not in evidence or was vouching for the credibility of the witness. He admitted on remand that he had no specific knowledge of what the complainant told any counselor.

A prosecutor may not argue the effect of testimony that was not entered into evidence at trial. *People v McCain,* 84 Mich App 210, 215; 269 NW2d 528 (1988). It is improper bolstering for a prosecutor to vouch for credibility of facts and evidence not in the case. See *People v Couch,* 49 Mich App 69; 211 NW2d 250 (1973). If defense

counsel is precluded by statutory privilege from examining counseling communications, it is error for the prosecutor to announce to the jury the contents of those communications.

Appellate review of improper prosecutorial remarks is generally precluded absent objection by counsel because the trial court is otherwise deprived of an opportunity to cure the error. *People v Buckey,* 424 Mich 1, 17; 378 NW2d 432 (1985); *People v Gonzalez,* 178 Mich App 526, 534-535; 444 NW2d 228 (1989); *People v Gonyea,* 126 Mich App 177, 189; 337 NW2d 325 (1983). An exception exists if a curative instruction could not have eliminated the prejudicial effect or where failure to consider the issue would result in a miscarriage of justice. *People v Duncan,* 402 Mich 1, 16; 260 NW2d 58 (1977); *People v Walker,* 93 Mich App 189, 198; 285 NW2d 812 (1979).

Had there been a timely objection by defense council when the prosecutor made his argument, the trial court could have cautioned the prosecutor and instructed the jury that the prosecutor had no knowledge of the content of any counseling the complainant testified she had undergone. Any misleading inference to the contrary could have been dispelled.

The defendant further asserts that his trial counsel's failure to object to the inappropriate remarks constitutes ineffective assistance of counsel. In order to succeed on such a claim, the defendant first must show that counsel's performance was below an objective standard of reasonableness under prevailing professional norms. The defendant must overcome a strong presumption that counsel's assistance constituted sound trial strategy. Second, the defendant must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would

have been different. *Strickland v Washington,* 466
US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984);
*People v Pickens,* 446 Mich 298; 521 NW2d 797
(1994).

During cross-examination of the complainant,
defense counsel pursued a theory in which he
asserted that the complainant told a lie the first
time she related the occurrence of sex between
herself and the defendant. His theory was that
once she told the lie the first time, she was com-
pelled to keep repeating the story. If defense coun-
sel had objected in front of the jury to the pros-
ecutor's presentation of the same scenario, he
might have undermined his theory of the case.
While the lack of an objection may have been
questionable strategy, absent the advantage of
hindsight, we cannot say that defense counsel
performed below the standards of a reasonably
competent attorney.[50] It is therefore unnecessary
for this Court to determine whether the lack of
objection prejudiced the defendant.

IV

Defendant Stanaway further asserts that the
trial court erred when it admitted the hearsay
testimony of Officer Robert Peters. As part of the
prosecution's case in chief, defendant's nephew,
Donald Stanaway was called to testify. The pros-

---

[50] Defense counsel pursued this theory in his closing argument to
the jury:

> [*Defense Counsel*]: She has told the story over and over again,
> [the prosecutor] says to at least nine people. After telling it and
> telling it and telling it to all these people, when would she get
> the opportunity to say I made it up, I'm sorry to all the people,
> didn't occur, it really occurred this way? She got locked in the
> first time she told the story, and nobody checked up on the
> details. If they had, they would have seen it was implausible, it
> couldn't have happened.

ecutor asked him if he had made a statement to
Officer Peters regarding an incriminating state-
ment the defendant had made to a witness, which
the witness denied ever having made:

[*People*]: Mr. Stanaway, do you recall talking to
Officer Peters about statements that Brian had
made to you?
[*Witness*]: No, I didn't tell him that Brian made
any statements directly to me.

* * *

*Q.* You never made any statement implicating
Brian with this incident?
*A.* I haven't talked to Brian. I don't talk to
Brian. Like I said, we weren't getting along.
*Q.* Okay. And you are saying that you never
told Officer Peters that Brian admitted that he
was having sex with a young girl?
*A.* I never said that.
*Q.* And Brian never told you that if he got
caught, he would get into a lot of trouble?
*A.* Like I said, I didn't talk to Brian and Brian
didn't talk to me.
*Q.* And you are related to Brian; right?
*A.* Brian is my uncle.
*Q.* Now, you indicated earlier that you were out
of town when this all happened?
*A.* That's right.
*Q.* You were down south; right?
*A.* Right.

* * *

*Q.* I just want to make sure I'm clear, Mr.
Stanaway. You are saying that you never—that
Brian never made any statements to you implicat-
ing himself with sex with a young woman?
*A.* I don't remember him doing that, no.
*Q.* You don't remember or he didn't?
*A.* I don't remember. I have a bad memory.
*Q.* Pardon?
*A.* I have a real bad memory.

*Q.* Okay.
*A.* I do.

The prosecutor then called Officer Peters to the stand. Officer Peters was the investigating officer in the case. He testified that he had interviewed the complainant and her parents and that he had interviewed the defendant and some of his family members. He testified that the complainant's testimony was basically the same as when she reported the incidents to him. He testified that the defendant denied the allegations. Over hearsay objections, the prosecutor then asked Officer Peters about what Donald Stanaway had to say:

> [*People*]: Did you ask him about this incident?
> [*Witness*]: I asked him if he knew [the complainant]. He stated he knew who she was but he didn't know her. He just knew who she was. And I asked him if his nephew [sic, uncle] Brian had ever mentioned anything to him about [the complainant] or any type of sexual activity between them.
> *Q.* What did he say?
> *A.* He told me that Brian never mentioned him —Brian never stated that he had any sex with a person by the name of [the complainant]. But on a couple of different occasions while Brian was intoxicated, he did state that he had "screwed a young girl," and if he was caught, he would be in a lot of trouble.
> *Q.* Now, this is a statement allegedly made from Brian to Don Stanaway, Jr.?
> *A.* Yes.

The trial court responded to defense counsel's hearsay objection to this line of questioning with a cautionary instruction to the jury, sua sponte:

> *The Court:* Well, Members of the Jury, evidence such as this, it's called a prior inconsistent state-

ment, and it's used, usable properly for only one purpose. And let me see if I can draw the distinction for you.

What a witness said on a prior occasion, like whatever Mr. Stanaway said to the officer, can't be used to determine—what he said before can't be used to determine whether or not the defendant is guilty or not guilty. So whatever he told the officer can't be used for that purpose.

Whatever he told the officer before can be used to decide if you are going to believe the witness, Mr. Stanaway, but you can't use it as substantive proof of what the witness may have said on a former occasion. So for that limited purpose, the objection is overruled, and you may proceed, Mr. Wiese.

The jury's attention was again drawn to this impeachment evidence during the final instructions given by the court:

[*The Court*]: Now, there has been some evidence in this case that the witness Donald Stanaway, Jr. made a statement to Officer Peters that differs from what his testimony was during trial. You may recall that during trial he was asked whether the defendant told him "I have screwed a young girl and I'm going to be in a lot of trouble if anybody finds out." And the witness, Donald Stanaway, Jr., denied making that statement. Later on, Officer Roberts was called, and he said, yes, the witness, Donald Stanaway, Jr., did make that statement.

Now, you have to be very careful about how you consider this evidence, it's called evidence of a prior inconsistent statement. The statement wasn't made during this trial. So you must not consider the statement itself when you decide whether the elements of the crime have been proven; in other words, decide whether or not the defendant has been proven guilty.

But, on the other hand, you are allowed to use

the evidence regarding that statement to help you decide whether you think the witness is truthful, the witness, Donald Stanaway, is being truthful. So consider the statement carefully. Ask yourself if the witness made the statement, whether it was true, and whether it differs from the witness' testimony here in court. Then remember that you may only use it to help you decide whether you believe Donald Stanaway, Jr. concerning the testimony that he gave here in court.

And if you should decide that Donald Stanaway, Jr. did make that statement to Officer Peters, the best that you can conclude from that is that the testimony of Donald Stanaway, Jr. should be rejected, should be thrown out and ignored. But that does not make the testimony of Officer Peters useful by you in deciding whether or not the defendant made such a statement or whether or not the defendant is guilty of the crimes with which he is charged.

The only relevance Donald Stanaway's testimony had to this case was whether he made the statement regarding his uncle's alleged admission. The witness had no direct knowledge of any of the alleged incidents and was out of town at the time they would have occurred. While prior inconsistent statements may be used in some circumstances to impeach credibility, MRE 613, this was improper impeachment.[51] The substance of the statement,

[51] We note that the prosecutor's impeachment of his own witness would have been improper at the time of trial under the court rules then in effect. MRE 607 permitted a prosecutor to attack the credibility of a witness only if the prosecutor was obliged to call the witness or if the testimony was contrary to that anticipated and was actually injurious to the calling party's case. While the prosecutor may or may not have anticipated that Donald Stanaway would deny making the statement, his denial did not hurt the prosecutor's case in the sense required by the rule. All the denial did was fail to establish a piece of evidence the prosecutor wanted the jury to hear.

MRE 607 has since been amended, effective March 1, 1991, to conform to Federal Rule of Evidence 607 and now provides:

purportedly used to impeach the credibility of the witness, went to the central issue of the case. Whether the witness could be believed in general was only relevant with respect to whether that specific statement was made. This evidence served the improper purpose of proving the truth of the matter asserted. MRE 801.

While the prosecutor could have presented defendant's alleged admission by way of the nephew's statement, he could not have delivered it by way of the officer's testimony because the statement would be impermissible hearsay. See *People v Carner,* 117 Mich App 560, 571; 324 NW2d 78 (1982). Likewise, a prosecutor may not use an elicited denial as a springboard for introducing substantive evidence under the guise of rebutting the denial. *People v Bennett,* 393 Mich 445; 224 NW2d 840 (1975). Here the prosecutor used the elicited denial as a means of introducing a highly prejudicial "admission" that otherwise would have been inadmissible hearsay.[52] The testimony of Officer Peters was that Donald Stanaway said that Brian Stanaway said that he had sex with a young girl. This would have been clearly inadmissible without Donald Stanaway's denial. It is less reliable in the face of the denial. Absent any remaining testimony from the witness for which his credibility was relevant to this case, the impeachment should have been disallowed.

---

The credibility of a witness may be attacked by any party, including the party calling him.

Because the new rule would be applied in the event of a new trial, the fact of impeachment alone is not dispositive of this issue, but the manner of impeachment must be analyzed.

[52] In *People v Standifer,* 425 Mich 543, 558; 390 NW2d 632 (1986), this Court distinguished the impeachment of a recanting witness whose testimony was unexpected and harmful to the prosecution's case from the situation in which a prosecutor deliberately places a witness on the stand in order to elicit a denial.

The defendant asserts that the error was hardly harmless. We agree. While the prosecution argued the impeachment was proper, he did not refute the defendant's assertion that the error was too prejudicial to be deemed harmless.[53] Generally, arguments not raised and preserved for review are waived. See, *People v Grant,* 445 Mich 535; 520 NW2d 123 (1994); *Napier v Jacobs,* 429 Mich 222, 227-228; 414 NW2d 862 (1987).

In our assessment of unfair prejudice in *People v Robinson,* 417 Mich 661, 665-666; 340 NW2d 631 (1983), we held that a trial judge abused his discretion when he allowed the defendant's prior criminal record to be admitted into evidence:

> [T]his evidence had a devastating effect on the defendant's right to a fair trial. We agree with the defendant that it "is simply incredible that anyone would hear all of those prior acts of criminal conduct and then remove them from their mind based upon an instruction by the court when they are then to consider the guilt or innocence of the

---

[53] Although not briefed or argued by the parties, we would note that where there is trial error in admitting hearsay testimony not admissible under the Michigan Rules of Evidence, there may be an issue regarding whether we must determine if the evidentiary ruling implicated constitutional error under the Confrontation Clause, US Const, Am VI and Const 1963, art 1, § 20, in order to properly assess harmless error. In *California v Green,* 399 US 149; 90 S Ct 1930; 26 L Ed 2d 489 (1970), the Supreme Court held that it is not a Sixth Amendment violation where hearsay was improperly admitted but the declarant testified and was therefore available for cross-examination. Where the declarant can be cross-examined about the prior inconsistent statement, there is no Confrontation Clause violation because the literal right to confront the witness has been satisfied. A state may develop a standard of harmless error at variance with the harmless error analysis set forth for constitutional error by the Supreme Court in *Chapman v California,* 386 US 18; 87 S Ct 824; 17 L Ed 2d 705 (1967), to be applied to incorrect rulings regarding its rules of evidence not amounting to a constitutional violation. *Green,* p 170.

We continue to reserve for another day the enunciation of the precise harmless error standard to be applied to preserved, nonconstitutional error. See *People v Anderson (After Remand),* 446 Mich 392, 407, n 39; 521 NW2d 538 (1994).

accused. The prejudicial impact of all of those past anti-social acts cannot be effectively removed from the jury's mind by a curative instruction."

Similarly, the admission of this improper statement that had the effect of a confession in the minds of the jury was not an error that, under the circumstances of this case, could be cured by a cautionary instruction. This trial essentially came down to a credibility contest between the defendant and the complainant. The complainant testified about the elements of the crime; the defendant denied any sexual involvement. There is little evidence that compares to the probative weight a confession carries, particularly when delivered by a police officer. The inference from the police officer's testimony was that the defendant admitted the acts he was accused of. Any nagging doubts the jury may have had about whether these sexual incidents took place between the complainant and the defendant were likely erased by the words he purportedly uttered to his nephew.

Likewise, we are of the opinion that in this case, the hearsay error was prejudicial. Under these circumstances, we conclude that allowing the police officer to present defendant's statement purportedly made to his nephew requires reversal of the defendant's conviction and a new trial.

V

In summary, defendant Stanaway's generalized assertion of a need to attack the credibility of his accuser is not sufficient to establish the necessary showing of a reasonable probability that the records contain information material to his defense to overcome the applicable statutory privileges. Despite our agreement that the prosecutor's refer-

ence during closing arguments to the substance of the confidential disclosures was improper, it does not require reversal because there was no objection, and a cautionary instruction could have cured the misleading inference. However, it was an abuse of discretion requiring reversal for the trial court, despite defense objections, to allow the improper impeachment of a prosecution witness with hearsay testimony that was highly prejudicial. Because the error was not harmless, we therefore reverse the decision of the Court of Appeals and remand for a new trial.

Defendant Caruso's assertion of particularized facts would support a determination that an in camera review of the victim's counseling records is required. The generalized assertion of a need for impeachment material would not. We vacate the decision of the Court of Appeals and remand to the trial court for a determination of whether an in camera review of the victim's counseling records in *People v Caruso* must be ordered because the defendant has demonstrated a good-faith belief, grounded in articulable fact, that there is a reasonable probability that the records contain material information that is material and favorable necessary to his defense.

*People v Stanaway* reversed and remanded.

*People v Caruso* vacated and remanded to the trial court.

Cavanagh, C.J., and Levin, Griffin, and Mallett, JJ., concurred with Brickley, J.

Riley, J. (*concurring*). Although I join Justice Brickley's discussion and result in part iv, I write separately to express my dissatisfaction with the nonconstitutional harmless-error doctrine in Mich-

igan. Despite guidance from both our court rules[1] and statute,[2] this Court has yet to fully examine the relevant considerations for nonconstitutional harmless error and certainly has failed to set forth a clear and concise nonconstitutional harmless-error test.[3] Instead, this Court has generally cho-

---

[1] An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, *unless* refusal to take this action appears to the court *inconsistent with substantial justice.* [MCR 2.613(A). Emphasis added.]

Moreover, our evidentiary court rule provides a similar harmless-error rule:

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence *unless* a *substantial right* of the party is affected, and

(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context, or

(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

\* \* \*

(d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting *substantial rights* although they were not brought to the attention of the trial court. [MRE 103. Emphasis added.]

[2] No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, *unless* in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a *miscarriage of justice.* [MCL 769.26; MSA 28.1096. Emphasis added.]

[3] Although this Court did appear to adopt a harmless-error test in *People v Robinson,* 386 Mich 551, 562; 194 NW2d 709 (1972), it is unclear whether that test applies to nonconstitutional error. However, even if it does, the question remains whether the Court's discussion of that test was dicta. Indeed, I note that if *Robinson* did

sen to rely on the harmless-error statute and court rules for the limited guidance provided therein in making this determination. *People v Travis,* 443 Mich 668, 686; 505 NW2d 563 (1993). From a plain reading of these rules, however, the vague concept of injustice certainly does not provide any meaningful help to appellate courts in reviewing nonconstitutional error.

Indeed, the lack of guidance from these sources has led many panels of the Court of Appeals to consider varying considerations, including an assumption that the federal constitutional harmless-error rule applies to nonconstitutional error.[4] See *Chapman v California,* 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705 (1967) (the prosecution must prove, and the court must determine, beyond a reasonable doubt that there is no "reasonable possibility that the evidence complained of might have contributed to the conviction"). However, this assumption fails to recognize that there are important state considerations relevant to this inquiry,[5] in-

purport to create a new test applicable to nonconstitutional error, the discussion of the relevant authorities was rather brief, given the degree of confusion regarding this issue. Accordingly, I question its continued relevance to nonconstitutional harmless error.

[4] There have been varying tests and considerations applied when analyzing harmless error. See, e.g., *Robinson, supra; People v Roberson,* 55 Mich App 413; 222 NW2d 761 (1974) (distinguishing between constitutional and nonconstitutional error); *People v Winans,* 187 Mich App 294; 466 NW2d 731 (1991) (not indicating any difference in tests and simply applying the two-part *Robinson* test); *People v Fredericks,* 125 Mich App 114, 118; 335 NW2d 919 (1983) ("Error is not harmless if, in the absence of the error, it is reasonably possible that some juror would have voted to acquit"); *People v Norwood,* 70 Mich App 53; 245 NW2d 170 (1976) (applying the beyond a reasonable doubt standard to an evidentiary error). However, a majority of this Court has never applied the beyond a reasonable doubt standard to a nonconstitutional error. Indeed, when reviewing nonconstitutional error, this Court has simply reviewed the error under the miscarriage of justice standard set forth in the harmless-error statute. *Travis, supra* at 686.

[5] Without having this issue fully briefed and argued, I reserve full explanation of these policies until the appropriate case.

cluding the policies implicit in the statute and court rules that have yet to be examined. Indeed, the United States Supreme Court in *Chapman, supra,* explicitly recognized a state's interest in this respect:

> The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law. But the error from which these petitioners suffered was a denial of rights guaranteed [by the federal constitution] . . . . Whether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied. With faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights. We have no hesitation in saying that the right of these petitioners not to be punished for exercising their Fifth and Fourteenth Amendment right to be silent—expressly created by the Federal Constitution itself—is a federal right which, in the absence of appropriate congressional action, it is our responsibility to protect by fashioning the necessary rule. [*Chapman, supra* at 21.]

While I do not attempt to fully explain or adopt a nonconstitutional harmless-error test in this opinion, I write separately to indicate the need for full briefing and argument on this important issue of state law. See *People v Anderson (After Remand),* 446 Mich 392, 407, n 39; 521 NW2d 538 (1994). Considering the frequent use of this doctrine and the many factors currently considered by

our courts,[6] a full and decisive explanation by this
Court would be in order. However, until this op-
portunity arises and the parties are properly pre-
pared to argue this issue, I likewise reserve full
consideration of this issue. Nevertheless, I agree
that this error, the admission of Officer Peters'
hearsay testimony, resulted in a miscarriage of
justice and thus cannot be deemed harmless.

BOYLE, J. (*concurring*). Although I agree with
the result in both *Stanaway* and *Caruso,* I write
separately because I disagree with the majority's
rationale. In these cases we deal with the ex-
tremely difficult problem of formulating a lawful
and usable approach to balancing a defendant's
due process right to a fair trial against resistance
to discovery based on claims of privilege.

In my judgment, the test for in camera review is
a plausible showing of need and materiality. The
test for disclosure and use is whether there is a
reasonable probability that material and necessary
information would affect the factfinder's determi-
nation of guilt or innocence. The issues are (1) the
nature of the privilege asserted, (2) the test for in
camera review, (3) the test for determining when
constitutional materiality requires discovery or use
of protected information, and (4) the remedy for
nondisclosure. The majority (1) creates too rigid a
barrier to a defendant's request for in camera
review, (2) treats all "privileges" as functionally
equivalent, (3) confuses the standard for in camera
review with the test for disclosure, and (4) assumes
that the remedy appropriate to resistance to dis-
covery of all information protected by an absolute
privilege is striking the witness' testimony.

The majority's rationale is based on two dubious
grounds, one that unnecessarily limits a defen-

[6] See n 4.

dant's right to in camera review, and a second that limits the viability of all privileges. There are two types of privileges—(1) conditional or qualified privileges and (2) absolute privileges. Statutes protecting confidential communications are construed to protect the communications from extrajudicial disclosure. Absolute privileges are those that expressly protect all disclosure, in court as well as out of court. Conditional or qualified privileges, which do not expressly bar in court disclosures, do not create an exception to judicial control under the Michigan Rules of Evidence.[1] The majority's implicit but erroneous assumption that all the statutes at issue bar in-court disclosure leads to its creation of too high a threshold for in camera review,[2] which, in my opinion, should be available on a showing of plausible need and materiality. At the same time, the majority creates too low a threshold for invading those few privileges that must be construed to be absolute. The theoretical internal inconsistency of this position produces this schizophrenic result: while all privileges yield on the same terms to in camera review, in camera review will hardly ever be available. The majority's approach thus achieves the remarkable feat of both underappreciating and overvaluing privileges in a single effort.

Moreover, the majority's failure to distinguish

[1] "Privilege is governed by the common law, except as modified by statute or court rule." MRE 501.

[2] The majority's test for in camera review requires that the evidence sought be *material,* meaning more than merely favorable or relevant to the defense. Implicit in this standard is recognition of our state's rape shield statute, MCL 750.520j(1); MSA 28.788(10)(1), which is a policy determination that certain logically relevant evidence is legally irrelevant. To the extent that a particularized request appears to seek information for a generally irrelevant purpose, that is, evidence of a rape victim's prior sexual conduct with others or sexual reputation as character impeachment, in camera inspection should be denied unless the defendant can show that it is not collateral and otherwise so material that denial would deprive him of a fair trial.

between those privileges that do not bar disclosure in court and those that do, leads to the erroneous conclusion that where a defendant makes the requisite showing of materiality for in camera review, the holder of an absolute privilege may continue to refuse to submit the protected information, resulting in the holder's testimony being struck. When privileges can be appropriately narrowed to avoid such clashes, and a sufficient showing overrides a privilege of confidentiality, the remedy is an order to the holder of the privileged information, failing which the consequence may be contempt.[3] Only when the privilege is absolute, and its purpose will be destroyed by invasion, will disclosure be dependent on waiver by the privilege holder.

The first step in analysis when a due process right to discovery is asserted and a privilege is invoked, is to examine the basis for the defendant's request. Where the defendant makes a plausible showing of materiality and favorability to his case, further consideration is in order. Passing the initial materiality test, a determination whether the privilege is absolute or conditional is necessary to assess whether further deliberation may be called for before in camera review is warranted. Where the statute establishing the privilege fairly permits a construction that in camera disclosure can be required as a screening device, in camera examination is appropriate. Even where the privilege invoked is absolute, if it cannot be said that in camera review would destroy the ends sought

---

[3] The consequence of failing to comply may thus be contempt. I do suggest that the trial court may appropriately use other means to encourage compliance with its order, such as requesting waiver or striking all or portions of the testimony. See n 29 and accompanying text. My point is only that if the privilege is properly construed as qualified or conditional, the policy behind the privilege is protected by in camera review and the holder must yield on the appropriate showing.

through the privileged communication, such review may still be proper. However, where the privilege cannot be narrowed, and in camera review would itself destroy its purpose, such continued scrutiny is inappropriate and may not be conducted unless the privilege holder yields, failing which the prosecutor must accept the burden of upholding the privilege.

Achieving in camera review, however, does not end the inquiry. A decision on disclosure to the defendant still awaits. At this stage, the test for disclosure is whether the protected material is both necessary and constitutionally material, as developed more fully below. This standard does not vary with the nature of the privilege.

The psychologist-patient privilege involved in *People v Caruso* is an absolute privilege protecting private communications. Although Caruso did not make an initially sufficient showing of plausible materiality, on the remand ordered by the majority,[4] the court should consider how allegedly truncated counseling, stemming from prior sexual abuse, is plausibly material to the claim of fabrication. If such a showing is made, the trial court must determine whether in camera review would itself destroy the privilege. I concur in the result in *People v Stanaway* regarding the defendant's desire for in camera review of the absolutely privileged sexual assault counselor-victim records. The social worker-client and juvenile diversion records sought by defendant Stanaway do not possess the same absolute character as the other privileges at issue in these cases; however, because I agree that the defendant's generalized assertions have failed

---

[4] Should remand result in an in camera review, the trial court should make a separate sealed record to be retained in the event of appeal to facilitate review of the in camera decision. See FR Crim P 16(d).

to make a plausible showing of materiality, I also concur in the majority's result denying in camera review of these records.

I

A

Contemporary case law of this Court has construed "privileges" broadly to uphold the right of a defendant in a criminal case to prevent in-court disclosure of relevant evidence. See, e.g., *People v Howe,* 445 Mich 923 (1994); *Howe v Detroit Free Press,* 440 Mich 203; 487 NW2d 374 (1992); *People v Hamacher,* 432 Mich 157; 438 NW2d 43 (1989); *People v Vermeulen,* 432 Mich 32; 438 NW2d 36 (1989). In these cases, however, the failure to engage in a discrete analysis that construes privileges as narrowly as possible in recognition of their impediment to the truth-seeking objective produces a manipulation of the standard for in camera review that jeopardizes the right of a defendant in a criminal case to a fair trial.

The majority today requires that, in order for a court to conduct an in camera review of any privileged records, a defendant must "establish a reasonable probability that the privileged records are likely to contain material information necessary to his defense . . . ." *Ante* at 649. My first point of departure from the majority's rationale is that this initial materiality requirement erects a higher initial barrier to in camera review than that articulated by the United States Supreme Court.

In *Pennsylvania v Ritchie,* 480 US 39, 58, n 15; 107 S Ct 989; 94 L Ed 2d 40 (1987), the Court rejected the government's resistance to in camera review because Ritchie had not established a "particularized" basis for his claim. The Court required

only a plausible showing of how the evidence at issue would be both material and favorable to the defense to secure in camera review under a statute creating a conditional privilege. *Id.,* citing *United States v Valenzuela-Bernal,* 458 US 858, 867; 102 S Ct 3440; 73 L Ed 2d 1193 (1982); see also *Exline v Gunter,* 985 F2d 487 (CA 10, 1993) (a denial of in camera review constituted a violation of due process, even where the state court found that the defendant failed to show a "particularized need" for the records sought).[5] I would adopt the *Ritchie* standard of materiality for the further review of all privileges, requiring a plausible showing of materiality and favorability in order to subject the records in the present cases to further consideration. At this initial stage of review, I see no reason to distinguish between absolute and conditional privileges.

*Valenzuela-Bernal, supra,* provides useful instruction on the plausible materiality standard. In that case, the Court sought to determine the requisite showing in order to demonstrate a violation of a defendant's right to compulsory process by the deportation of possible defense witnesses before affording defense counsel an opportunity to interview the deportees. The Court rejected the suggestion that the testimony of the witnesses need only be shown to be of "conceivable benefit" to the defense because such a standard was limited only by the imagination of defense counsel or the trial judge. *Id.* at 866. The Court held that the defen-

---

[5] It was at the in camera review stage that the Court imposed a higher standard of materiality in *Ritchie*. At that point, the Court suggested that reversal of Ritchie's conviction should be ordered only "if there is a reasonable probability" (defined as "a probability sufficient to undermine confidence in the outcome") that, had the evidence been disclosed, the result would have been different. *Ritchie, supra* at 57. This standard is taken from *United States v Bagley,* 473 US 667; 105 S Ct 3375; 87 L Ed 2d 481 (1985), involving the prosecution's duty to disclose exculpatory evidence.

dant "must at least make some plausible showing of how [the deportees'] testimony would have been both material and favorable to his defense." *Id.* at 867. Expanding on this requirement, the Court turned to "cases in what might loosely be called the area of constitutionally guaranteed access to evidence . . . ." *Id.*[6] While noting that a defendant's right of access to evidence was generally measured by the prejudicial effect of denial of such access, the Court admitted that the specificity of materiality required should be relaxed, but not wholly dispensed with, where a defendant has had no opportunity to determine what favorable information the witness, or the evidence, might possess. In that case, the defendant must show the events to which the evidence might relate, and the relevance of those events to the crime charged. This approach suggests that defendants seeking discovery of privileged information must make an initial showing of plausible materiality and favorability by demonstrating what events the information might relate to and the relevance of those events to the defendant's theory of defense "in ways not merely cumulative to the testimony of available witnesses." *Id.* at 873.[7] The majority's high initial burden on the defendant fails to account for the fact, acknowledged by the United States Supreme Court, that neither the defendant nor the court has yet had an opportunity to review the records in question at this initial stage. This handicap

[6] The plausible materiality standard adopted in *Ritchie* is thus clearly not limited to the type of privilege at issue in that case, but is more broadly applicable to a defendant's right to evidence where he has no means by which to determine the favorable character of the evidence sought with great specificity.

[7] While the Court in *Valenzuela-Bernal, supra* at 871, n 8, suggests that even a lower standard of materiality may be in order when a defendant has no knowledge of the contents of the evidence in question, the adoption of the plausible materiality standard in *Ritchie* counsels against such action in the present setting.

dictates a lower threshold for initial review than the ultimate proof required for disclosure.

> [A] lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege. [*United States v Zolin,* 491 US 554, 572; 109 S Ct 2619; 105 L Ed 2d 469 (1989).]

The detail asserted may assist the court in evaluating how the privileged material might be relevant to the defense,[8] but it need not meet a standard of probable necessity. As observed in another context, but equally apposite here:

> .[A] trial judge cannot accurately evaluate the litigant's showing of necessity without knowing something of the content of the information sought. There is no judicial algebra by which a court can determine how badly a litigant needs "x."[9]

B

Under the plausible materiality and favorability standard, defendant Stanaway has failed to articulate a sufficient basis for discovery of the social worker-client and juvenile diversion records. Stanaway can only justify his discovery request by a hope to unearth some statements inconsistent with the victim's prior testimony. This generalized aspi-

---

[8]   Although the obligation to disclose exculpatory material does not depend on the presence of a specific request, we note that the degree of specificity of [the defendant] Ritchie's request may have a bearing on the trial court's assessment on remand of the materiality of the nondisclosure. [*Ritchie, supra* at 58, n 15, citing *Bagley, supra* at 682-683.]

[9] Hardin, *Executive privilege in the federal courts,* 71 Yale L J 879, 893-894 (1962).

ration provides no reasonable justification for further in camera review. As noted in *Ritchie, supra* at 58, n 15, a defendant "of course, may not require the trial court to search through the [requested files] without first establishing a basis for his claim that it contains material evidence." Because Stanaway articulated no different basis for his request for discovery of the psychologist-patient records than he did for those protected by qualified privileges, it is apparent that discovery of this evidence is also unavailable.

Because Caruso has not been tried, I agree with the majority that a showing of plausible necessity might yet be made. However, the defendant's claim in *Caruso* that the listing of a psychologist as an expert witness might permit access to other privileged records on the basis of a good-faith belief that the records may reveal another explanation for the symptoms does not set forth a plausible basis for in camera review. There is no showing of relevancy that is not merely cumulative with respect to the testimony of the expert witness. The opinion of the psychologist/expert witness may be offered only with respect to the behavior traits of the victim. *People v Beckley,* 434 Mich 691; 456 NW2d 391 (1990). The expert witness' records will be available, thus affording the defendant the basis for full exploration of the expert's opinion. Nor can a plausibly sufficient justification for disclosure of the privileged records be grounded on the claims that the complainant was abused by her father, has not received proper treatment and has a warped sense of right or wrong. These claims are directed at a collateral act. Their relevance to fabrication of this incident is supported only by conclusory statements. The defendant asserts before this Court that the relevance of the requested information is to rebut the

inference that the youthful victim would have knowledge sufficient to describe the alleged acts by the defendant unless they actually occurred. These assertions are also insufficient to warrant in camera review. In order to find plausible relevancy, the defendant must articulate some similarity between the possible abuse by the father and the charges of sexual contact in the present case or otherwise demonstrate the necessary relevancy.[10] See, e.g., *State v Oliver,* 158 Ariz 22; 760 P2d 1071 (1988), *Commonwealth v Rathburn,* 26 Mass App 699; 532 NE2d 691 (1988).[11]

II

The United States Supreme Court has disclaimed any intent to constitutionalize the discovery process. *Weatherford v Bursey,* 429 US 545; 97 S Ct 837; 51 L Ed 2d 30 (1977). Moreover, "[p]rivileges are not all equally important; they vary with the privacy interests they protect and the policies they promote." Saltzburg, *Privileges and professionals: Lawyers and psychiatrists,* 66 Va L R 597, 622 (1980), quoted in 1 McCormick, Evidence (4th ed), § 77, p 290, n 5. Lacking clear guidance from the United States Supreme Court, the majority has collapsed all state privileges, irrespective of their relative importance, qualified as well as un-

[10] My dissatisfaction with Caruso's showing to date stems from the absence of a logical nexus between the alleged past abuse and the possibility of fabrication. Taken to its logical conclusion, the proposition would support a claim that records containing information of a trauma-producing sexual incident, must be disclosed whenever there is an allegation that the trauma is unresolved.

[11] Caruso also tries to support his discovery request on the basis that evidence was presented at pretrial hearing relating to the victim's alleged sexually explicit note to someone other than the defendant. However, testimony on this issue will be available at trial to provide a basis for inquiry regarding the victim's sexual awareness. This justification for discovery of the privileged records is also flawed because it seeks information that is cumulative.

qualified, and governmental as well as purely private, to possible violation under the same method of review.

All the privileges at issue in the instant cases are statutorily protected by language that evinces a respect for the privileged communications. However, only the privileges afforded communications with sexual assault counselors[12] (at issue in *Stanaway*), and psychologists[13] (at issue in *Caruso*), specifically express an intent to bar the use of records of such communications from court proceedings.[14] Because expansive construction of privileges interdicts the court's primary truth-finding function, privileges must be interpreted as being consistent with that purpose whenever possible. Thus, my second point of departure from the majority is that I disagree that all the statutes at issue here create privileges that expressly dictate that the informa-

[12] MCL 600.2157a(2); MSA 27A.2157(1)(2) provides:

Except as provided by section 11 of the child protection law, Act No. 238 of the Public Acts of 1975, being section 722.631 of the Michigan Compiled Laws, a confidential communication, or any report, working paper, or statement contained in a report or working paper, given or made in connection with a consultation between a victim and a sexual assault or domestic violence counselor, *shall not be admissible as evidence in any civil or criminal proceeding without the prior written consent of the victim.* [Emphasis added.]

[13] MCL 330.1750(2); MSA 14.800(750)(2), which states the pertinent scope of the psychologist and psychiatrist privilege, provides:

Privileged communications *shall not be disclosed in civil, criminal, legislative, or administrative cases or proceedings, or in proceedings preliminary to such cases or proceedings,* unless the patient has waived the privilege, except in the circumstances set forth in this section. [Emphasis added.]

[14] Further distinction between the sexual assault counselor-victim and psychologist-patient privileges is possible, on the basis of the language of the statutes, but such distinction draws too fine a line. Both statutes bar admission of the privileged material in civil or criminal proceedings absent a waiver.

tion be barred from use in judicial proceedings. Neither the social worker-client privilege, MCL 339.1610; MSA 18.425(1610), nor the privilege for records kept pursuant to the juvenile diversion program, MCL 722.828-722.829; MSA 25.243(58)-25.243(59), contain such an expression of legislative intent. These statutes create qualified privileges to protect confidential communications,[15] and do not erect an absolute bar to the discovery of privileged information. *Howe v Detroit Free Press,* 440 Mich 203, 233-234; 487 NW2d 374 (1992) (opinion of BOYLE, J.). While I agree with the majority that the trial court must weigh the legislative purpose in creating qualified privileges in the context of its particular evidentiary value to the accused, thus honoring confidentiality while preserving relevant evidence, the same method of analysis cannot be employed where the Legislature has expressly erected an absolute bar to in-court disclosure.

The statutory privileges extended to communications with sexual assault counselors and psychologists evince the highest societal regard,[16] both for the relationships in which the communications

[15] The statute concerning social worker-client communications provides both that there not be compelled disclosure of communications with clients and that the relevant communication is "confidential." Confidentiality concerns the extrajudicial disclosure of information, not its disclosure in judicial proceedings. *Howe v Detroit Free Press,* 440 Mich 203, 229; 487 NW2d 374 (1992) (opinion of BOYLE, J.), citing 23 Wright & Graham, Federal Practice & Procedure, § 5437, p 892, n 15.

The relevant statute regarding the juvenile diversion records contemplates that the records may be revealed by court order "to persons having a legitimate interest." MCL 722.828(1); MSA 25.243(58)(1). Even though such legitimate interest may be limited to making decisions regarding diversion of a minor, MCL 722.829(1); MSA 25.243(59)(1), the allowance for *some* use of the records by a court and the absence of an express preclusion from use of the records in judicial proceedings causes me to find that the privilege provided by this statute is not absolute. *Pennsylvania v Ritchie, supra* at 57-58.

[16] While the statutes articulating the scope of the sexual assault counselor-victim and psychologist-patient privileges allow for com-

arise and for the critical importance the confidentiality of such communications have in the successful achievement of the ultimate goal of those relationships.[17] The question is whether these intended absolute privileges[18] may be vindicated or when and how they must be qualified to accommodate a defendant's constitutional right to due process.[19]

pelled waiver in limited situations, the express evidentiary bar in criminal or civil proceedings, absent voluntary waiver, provides a definitive indication of an intent that the prohibition in these situations be absolute.

[17] Analysis of the bill creating the sexual assault counselor privilege notes that

[v]ictims of sexual assault or domestic assault are often gravely in need of counseling to cope with the trauma of their experiences. The assurance of the confidentiality of all communications between a counselor and a client is vital to effective therapy. Those victims of abuse or assault who receive their counseling from members of the clergy or from licensed professionals such as psychiatrists, psychologists, or social workers have that assurance . . . . [House Legislative Analysis, HB 4609, November 16, 1983.]

[18] The specter of disclosure of records of these privileged communications, even to a trial judge for in camera review, threatens the basic tenet of confidentiality upon which these relationships are founded. This intrusion should not be underestimated. Slovenko, *Psychiatry and a second look at the medical privilege*, 6 Wayne L R 175, 185 (1960). The process also creates the possibility of greater exposure of the privileged communications, dependent upon the decision of the trial judge. While this potential damage to the relationship engendered by a privilege must be considered, however, it must also be recognized that review by a judge in chambers is significantly less invasive of that relationship than ultimate disclosure to a defendant. Cf. *Zolin, supra* at 568 ("[D]isclosure of allegedly privileged materials to the district court for purposes of determining the merits of a claim of privilege does not have the legal effect of terminating the privilege").

[19] I limit my analysis, as does the majority, to the defendant's due process right to a fair trial. *Ante* at 649, n 1. The right of confrontation has been found to be limited to a right at trial to unfettered cross-examination, not "a constitutionally compelled rule of pretrial discovery." *Pennsylvania v Ritchie, supra* at 52. But see *id.* at 61-62 (Blackmun, concurring in part and concurring in the judgment) ("[T]here might well be a confrontation violation if, as here, a defendant is denied pretrial access to information that would make possible

I do not doubt that the United States Supreme Court might find absolute privileges unconstitutional as applied. See *Michigan v Lucas,* 500 US 145; 111 ·S Ct 1743; 114 ·L Ed 2d 205 (1991). "[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."[20] However, given the scope of the cloak of privacy created by the Legislature, the protection afforded to the privacy of crime victims by our state constitution, Const 1963, art 1, § 24,[21] and the fact that we are sailing in constitutionally uncharted waters, a measured response to the question when in camera review and disclosure is required is appropriate.

### III

Given the lack of guidance from the Supreme Court with respect to the initial materiality standard and the ultimate issue of disclosure and use of privileged information,[22] some discussion is in order regarding the mode of analysis to be used in the further proceedings in *Caruso.* For the sake of

*effective* cross-examination of a crucial prosecution witness." Emphasis added.) See also *Kentucky v Stincer,* 482 US 730, 738, n 9; 107 S Ct 2658; 96 L Ed 2d 631 (1987). The application of the right of compulsory process to the current problem remains unsettled, but has been found to be sufficiently protected by a due process consideration. *Ritchie, supra* at 56.

[20] *United States v Nixon,* 418 US 683, 710; 94 S Ct 3090; 41 L Ed 2d 1039 (1974).

[21] Const 1963, art 1, § 24 provides, in relevant part:

(1) Crime victims, as defined by law, shall have the following rights, as provided by law:
The right to be treated with fairness and respect for their dignity and privacy throughout the criminal justice process.

[22] The jurisprudence of our sister states has tended to take an all or nothing position, *ante* at 670-677, and therefore also fails to provide much constructive assistance.

illustration, I include a discussion regarding the privileges at issue, but already disposed of, in *Stanaway.*

There is no authority from the United States Supreme Court that holds that absolute statutory privileges protecting private relationships are unconstitutional on their face. The Court has never dealt squarely with the validity of a statutorily mandated, societal privilege that expressly bars introduction of privileged material into judicial proceedings. In *Pennsylvania v Ritchie, supra,* the Court expressly refused to articulate an opinion regarding the result of a direct clash between a defendant's pretrial discovery claim to records of a government agency and a specific statutory bar to the desired access. The defendant's request for exculpatory material was opposed in *Ritchie* by a statute that permitted disclosure of confidential information to a court in appropriate circumstances. The Court construed the statute narrowly to hold that "[g]iven that the Pennsylvania Legislature contemplated *some* use of [Children and Youth Services] records [the records being sought for discovery] in judicial proceedings, we cannot conclude that the statute prevents all disclosure in criminal prosecutions." 480 US 57-58.[23] (Emphasis in the original.)

The majority acknowledges this limitation on *Ritchie,* but implicitly concludes[24] that any privi-

[23] The statutory exclusion in *Ritchie* severely limits its usefulness in determining the proper scope of an absolute privilege. The case is instructive, however, in its express caution against application of its holding to absolute privileges.

[24] I do not fault the majority for acceding to the temptation to simplify the trial court's duty at the in camera stage to one of mere verification. *Ante* at 679, n 40. However, where such simplification is at the expense of important and compelling considerations that can only be given sufficient consideration by the trial court through review of the privileged information, the cost exacted in the name of administrative efficiency is too high.

lege must potentially yield to a sufficiently compelling discovery claim, basing its holding on the Court's high regard for a defendant's constitutional rights and a survey of the jurisprudence of other states. *Ante* at 677-678. Although the rights of accused persons are so fundamental a priority of the American system of justice that we can safely predict that the United States Supreme Court will not permit substantial limitations of these core protections, we should not anticipate that, as a corollary, the Court will treat all privileges alike.

In addition to *Ritchie,* other United States Supreme Court opinions relevant to an evaluation of absolute privileges fail to provide clear guidance. In *Roviaro v United States,* 353 US 53; 77 S Ct 623; 1 L Ed 2d 639 (1957), the Court determined that the common-law informer's privilege[25] had to give way where it was determined that the defendant had demonstrated a vital need for access to the informer's identity. The Court noted that the scope of the privilege was limited by its underlying purpose, in this case the furtherance and protection of the public interest in effective law enforcement. *Id.* at 59-60. The advancement of that interest paled when compared against the defendant's right to prepare his defense. Thus, under the circumstances of the case, the privilege yielded to the defendant's paramount right.

In *United States v Nixon,* 418 US 683; 94 S Ct 3090; 41 L Ed 2d 1039 (1974), the Court found that the president's generalized claim of absolute executive privilege, made in an attempt to bar in camera review of records of conversations between the president and his close advisors, had to yield to

---

[25] The informer's privilege is "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro* at 59.

the special prosecutor's demonstrated, specific need for evidence in a criminal trial. While the Court acknowledged the constitutional underpinnings of executive privilege, it found that the president's claim exceeded the scope of that privilege. *Id.* at 706-707.[26] The Court did not hold that a privilege could never be maintained against the fundamental due process right to the production of evidence at a criminal trial, but, rather, found fault in the broad, generalized privilege being asserted. The Court quoted with approval the proposition that " 'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege . . . ." *Id.* at 709, quoting *Branzburg v Hayes,* 408 US 665, 674; 92 S Ct 2646; 33 L Ed 2d 626 (1972). Emphasizing the modest quantity of, and restrictive criteria for, legitimate privileges, the Court nevertheless cited the attorney-client and priest-penitent privileges as examples of valid prohibitions against forced disclosure. *Nixon, supra* at 709-710.[27] Acknowledging the important nature of the privilege asserted by the president, the Court instructed that the information sought should be presumptively privileged and that the special prosecutor could only defeat such assertion by demonstrating that the material was " 'essential to the justice of the [pending criminal] case.' " *Id.* at 713, quoting *United States v Burr,* 25 F Cas 187, 192 (No. 14,694) (CCD Va, 1807).

---

[26] The opinion suggests that the scope of executive privilege may be limited to the protection of military or diplomatic secrets. *Id.* at 710-711.

[27] It is important to note that *Nixon* concerned the claim of a defendant's privilege, rather than a claimant's assertion of privilege against a defendant's due process right. *Nixon* is important for our purposes in acknowledging the validity of privileges, asserted within their proper scope, and the Court's continued attempt to balance the protection provided by a privilege against a legitimately demonstrated need for the protected information.

Finally, restrictions on a defendant's opportunity to cross-examine a witness because of a statutory privilege were questioned in *Davis v Alaska,* 415 US 308; 94 S Ct 1105; 39 L Ed 2d 347 (1974). The Court found that a state statute barring admission of a witness' juvenile record in criminal proceedings impermissibly denied the defendant his right of confrontation under the facts of the case. The witness had provided the prosecution with testimony inculpating the defendant in the crime. The defendant sought to use the witness' juvenile record and the fact that he was on probation at the time of his identification of the defendant to show that the witness may have been under undue police pressure at the time of identification and to call into question the truthfulness of his answers during cross-examination. *Id.* at 311-314. The Court framed the question as one of the "adequacy" of the scope of the permitted cross-examination, and again embarked on a balancing test of the state's interest in protecting the anonymity of juvenile offenders in the interest of furthering the rehabilitative goals of the juvenile corrections system against the right of the defendant to effective cross-examination. *Id.* at 318-319. Focusing on the specific case before it, the Court found that "[w]hatever temporary embarrassment might result to [the witness] or his family by disclosure of his juvenile record—if the prosecution insisted on using him to make its case—is outweighed by the petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness." *Id.* at 319.

IV

From the background of precedent discussed above, drawing guidance to aid in evaluation of

discovery requests for information protected by privileges that successfully pass the initial materiality test is difficult. As noted, for purposes of illustration it will be assumed that the discovery requests in both the present cases have withstood the first materiality challenge. Implicit in such guidance is an assumption that the United States Supreme Court would uphold absolute statutory privileges protecting private communications as being constitutional on their face and an admission that they may be unconstitutional as applied. The Supreme Court has left this question open.[28]

If a privilege is conditional, there is no need for further consideration before in camera review. The defendant in such a case has made a plausible showing of materiality and favorability, and the considerations at in camera review, discussed below, await. In *Stanaway,* had the challenge to the social worker-client and juvenile diversion records privileges met the plausibility standard, the trial court properly would have ordered the records submitted for in camera review.

Where there is a clear indication that a privilege was intended to block the introduction of the information protected into judicial proceedings, however, I would hold that the privilege is an absolute bar to the discovery of the privileged material by a defendant in a criminal proceeding if, under the facts of the particular case, defeat of the privilege would preclude the achievement of the goal sought through the privileged communication. Discovery of the privileged information in this case is only possible through waiver of the

---

[28] We express no opinion on whether the result in this case would have been different if the statute had protected the CYS files from disclosure to anyone, including law enforcement and judicial personnel. [*Ritchie* at 57, n 14.]

privilege by its holder. If maintenance of the privilege is of such an imperative quality, and no waiver is forthcoming, the prosecutor must bear the burden of the privilege, either by being barred from calling the privilege holder as a witness or dismissing the charges against the defendant.[29]

Analysis of the effect of violation of the absolute privilege on the ends sought through the communication should be initiated before any in camera review. It thus serves as an overriding hurdle to further in camera inquiry. When the preliminary showing of the requisite materiality of the evidence sought has been made, and the privilege has been asserted, the prosecutor, representing the interests of the privilege holder, and the defendant should present their respective arguments regarding the effect disclosure would have on the goals of the privilege.[30] While in no way seeking to limit the breadth of the arguments regarding the maintenance of the absolute privilege, relevant inquiry might include consideration of the particular ends that are expected to be achieved through the privileged communication, the reason for the initiation of the communication, and alternative means for accomplishing the ends sought.[31]

---

[29] A third, less severe remedy may be satisfactory in some cases in which the witness' privilege does not relate to testimony concerning a substantive element of the defendant's case. In such instance, the witness' testimony need not be completely barred, and only the portion related to the privileged information struck. Weisberg, Defendant v Witness: *Measuring confrontation and compulsory process rights against statutory communications privileges,* 30 Stan L R 935, 982 (1978).

[30] Weisberg, n 29 *supra* at 986-987. While Weisberg would include the privilege holder and the party to whom the privileged communication was directed in this meeting, a preferable approach is to at least initially allow the prosecutor to represent the privilege holder's interests. Forcing the privilege holder to argue the importance of the privileged communication might well unintentionally visit upon that party the very same injury that would result from disclosure of the privileged material.

[31] Even where a privilege is statutorily absolute, discovery of privi-

The' validity of privileges against the introduction of relevant evidence, in order to protect "weighty and legitimate competing interests," has been recognized by the United States Supreme Court. *Nixon, supra* at 709. What has not been clearly expressed is the particular privileges that sufficiently protect these interests to withstand challenge. Legislatures, through statutes and constitutional directives, are in a better position to make the societal value judgments necessary to determine if a privilege should be presumptively absolute.[32] However, the difficulty in resolution, and ultimate clash of the dictates of an absolute privilege and the truth-seeking goal at trial, Weisberg, Defendant v Witness: *Measuring confrontation and compulsory process rights against statutory communications privileges,* 30 Stan L R 935,

leged information may not always preclude achievement of the goal sought through the communication. In a given case, the relationship developed between a patient and counselor may be strong enough to withstand limited disclosure of past communications, or the relationship may not yet have developed to a point of confidentiality that would be endangered by disclosure. Where a patient is engaged in alternate forms of counseling, disclosure of information from one counselor may not preclude achievement of the goal of the patient's treatment through another. On the other hand, where resolution of a patient's emotional or psychological problem is only being pursued through treatment by a single counselor with whom the patient has built a relationship of trust, engendered by the privileged nature of their communication, disclosure of such communications may preclude further progress in the patient's treatment. These examples serve only as illustrations, in a patient-counselor setting, of the myriad of possible scenarios that may be present in a particular case, and are in no way exhaustive of the situations or relationships that may allow for, or counsel against, disclosure of absolutely privileged information.

[32] In theory at least, courts are not so well-equipped as legislatures either to determine the validity of the value judgments involved in creating particular privileges or to assess "empirically . . . the general harm that overriding a privilege may cause privilege holders." [White, *Evidentiary privileges and the defendant's constitutional right to introduce evidence,* 80 J Crim L & Criminology 377, 425, quoting Weisberg, n 29 *supra* at 971. Additional citation omitted.]

938 (1978), counsel against creation of more than a very few, clearly articulated and soundly reasoned absolute privileges. *Howe, supra* (opinion of BOYLE, J.). With this caveat, I leave to that branch of government the burden of determining what privileges should be considered absolute. By acknowledging the Legislature's duty in this regard, I do not preclude the possible absolute character of those privileges originating at common law. *Privileged communications,* 98 Harv L R 1450, 1456-1458 (1985) (attorney-client and spousal privileges originated at common law, but were not absolute in application).

These observations regarding the Legislature's duty do not absolve courts of their responsibility for interpretation and application of privileges. In *United States v Nixon, supra,* the Court considered the injury that defeat of the asserted privilege for presidential communications would have on the goal of the privilege to encourage frank and honest discussions between the president and his advisers. The Court found that the president's executive privilege had its origins in Article II of the United States Constitution. *Id.* at 705-706. While acknowledging that the "interest in preserving confidentiality is weighty indeed and entitled to great respect," the Court stated, "we cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution." *Id.* at 712 (citation omitted). Similarly, in *Davis v Alaska, supra,* the Court considered the possible injury to the goal of the privilege afforded by statute to juvenile records that would result from disclosure of those records through cross-examination of the witness, but characterized such injury as merely a "temporary

embarrassment" to the witness or his family, not on par with the defendant's right of confrontation. *Id.* at 319.

Where an absolute privilege is clearly intended by statute, I would allow the court to weigh the anticipated injury in that case to the goal of the privileged communications under consideration, similar to the Court's analysis in *Nixon* and *Davis.* This forces the tribunal to come to grips with the importance of the privilege, not just in the abstract, but in the context of the facts of the particular case. Thus, in further proceedings regarding the psychiatrist-patient privilege in *Caruso,* if a showing of plausible materiality for discovery of material that is expressly exempted from in court disclosure is made, further analysis is in order. If the ends of the absolute privilege would be destroyed by in camera review, the court has no authority to invade it and is precluded from further inquiry unless the privilege holder yields. Similar analysis would apply to discovery of the records protected by the sexual assault counselor privilege in *Stanaway,* had the defendant been able to pass the initial materiality test.

As I have noted above, a determination whether violation of a statutorily absolute privilege in a particular case would preclude achievement of the ends sought through the communication dictates a specific factual analysis. Such analysis was not done in the trial courts in the present cases, and this Court has insufficient information to legitimately make such a determination on the basis of the record before it. In this connection, it bears repeating that appellate courts can review these questions only on the basis of an adequate record. Thus I am unable at this juncture to predict the probable injury from disclosure of the records protected by the sexual assault counselor privilege in *Stanaway* and the psychologist privilege in

*Caruso.* For the sake of further discussion, however, I assume that the ends of the privileged communications would not be precluded by possible disclosure and move on to considerations for in camera review.

Assuming that defendant Caruso makes a showing on remand of plausible materiality for discovery of the records protected by the psychologist-patient privilege, under my test the trial court should make a preliminary determination regarding the gravity of the injury. If the injury is grave and the holder will not yield, the prosecutor will bear the consequences.[33]

## V

The final issue regarding disclosure of privileged information to the defendant who has made a successful showing of the need for in camera review is the trial court's determination of the information that should be disclosed. That process encompasses again weighing the defendant's right to the information against privileges that are now acknowledged to be susceptible to breach, but the balancing takes a different focus. At this final stage of review, the policy base for the privilege at issue should still be respected,[34] and the information disclosed to the defendant only upon a sufficient constitutional showing of need.

## A

When the focus shifts to the question of a work-

---

[33] Further useful guidance may be provided to the trial court in considering Caruso's materiality claim by Veilleux, anno: *Admissibility of evidence that juvenile prosecuting witness in sex offense case had prior sexual experience for purposes of showing alternative source of child's ability to describe sex acts,* 83 ALR4th 685.

[34] The privilege may be respected by excision of material on grounds of relevancy or admissibility, *Nixon, supra* at 715.

able framework for evidentiary rulings on disclo-
sure of privileged information, we again turn to
the limited sources available for guidance.[35] The
United States Supreme Court thus far has ex-
pressly characterized the right of the defendant in
due process terms, suggesting that as against a
claim of privilege, material that "probably would
have changed the outcome of his trial," must be
disclosed. *Ritchie, supra* at 58. Because it is the
right to a fair trial that is implicated, trial courts
must make an a priori determination that without
use of the protected information, confidence in the
reliability of the outcome of the trial would be
undermined. *United States v Bagley,* 473 US 667;
105 S Ct 3375; 87 L Ed 2d 481 (1985).

Illustration of the requisite materiality of privi-
leged information is provided by *Roviaro v United
States, supra.* The informer's privilege at issue in
that case was premised on the furtherance of
effective law enforcement. *Id.* at 59. By allowing
the government to assert that an informer's iden-
tity was privileged, the government's task in ob-
taining information inculpating the defendant was
eased.[36] While the Court did not question the legiti-

[35] The refusal to order disclosure has been reviewed under an abuse
of discretion standard, *United States v Moore,* 954 F2d 379, 381 (CA 6,
1992); *United States v Jenkins,* 4 F3d 1338, 1341 (CA 6, 1993).

[36] The need to conduct effective cross-examination is one of three
principles that one commentator has suggested for appropriate analy-
sis of discovery requests for privileged information. White, n 32 *supra.*
In addition to the cross-examination principle, Professor White would
examine the privilege at issue to determine if it is designed in
significant part to assist the government in performing one of its
essential functions, such as law enforcement, see *Roviaro v United
States, supra* (informants privilege); or was capable of even-handed
application, see *Washington v Texas,* 388 US 14; 87 S Ct 1920; 18 L
Ed 2d 1019 (1967) (a state statute that barred testimony of a copartici-
pant in a crime when offered by defendants as exculpatory evidence,
but allowed as evidence for the prosecution, denied the defendant his
right to compulsory process). These principles may be useful to
determine when a privilege has tipped the fair balance at trial in
favor of the government and make it appropriate to assign to the

macy of the government's interest in that case, it found that the privilege had to yield when the information protected by the privilege was "relevant and helpful to the defense of the accused, or . . . essential to a fair determination of a cause . . . ." *Id.* at 60-61. While the Court articulated a confusing "relevant and helpful" or "essential" standard of materiality in *Roviaro,* a closer look at the facts shows that the information sought—the informer's identity—was of vital importance to the defense. See *United States v Valenzuela-Bernal, supra* at 870-871. The informer was the only party participating with the defendant in the drug transactions for which the defendant had been accused, and the only witness who could possibly contradict the testimony presented by the government.

A determination whether the privilege must yield depends on the significance of the privileged information in the particular circumstances of the case, that is, its probative force. Thus, while disclosure of the informant's identity in *Roviaro* was of vital importance because he was the only witness to the transaction charged, informant identity is denied where the informant does not actively participate in the transaction that generates the charge, or his information would be merely cumulative. *United States v Mendoza-Salgado,* 964 F2d 993 (CA 10, 1992). Evidence is material only if there is a reasonable probability that if it is disclosed to the defense, the result of the proceeding will be different. *United States v Parker,* 836 F2d 1080, 1083 (CA 8, 1987) quoting *Bagley, supra* at 682.

prosecution the burden of disproving the materiality and need for the privileged information requested. Because the only principle at issue in the present cases, that of effective cross-examination, is considered in the necessity prong of the disclosure evaluation, further development of the applicability of these principles at this time is unwarranted.

Because there is no generalized constitutional right to discovery, the test for constitutional relevance must be higher than a requirement that the evidence would be merely helpful to the defense. The existence of the privilege, qualified or absolute, indicates that the information encompassed by it is entitled to special protection. A court may therefore decline to disclose such evidence, where its potential benefit to the defendant is available from other sources. This requirement dictates that the information must be necessary to, and not merely supplementary of, a particular mode of impeachment or to defendant's theory of defense, that is, it must be unavailable from any alternative source. Thus, as the majority correctly notes, a defendant is not deprived of effective cross-examination if the material withheld, like prior inconsistent statements, is merely cumulative of the traditional lines of impeachment. The defendant is not precluded from such inquiries by a privilege, but only precluded from discovery of one source of such inconsistencies.

*Davis v Alaska, supra,* while examined as a Confrontation Clause violation affecting testimony at trial, is instructive regarding the requisite standard of necessity. The privilege rule at issue in that case was designed primarily, or at least incidentally, to benefit the state rather than to protect a private communication. In addition, the information protected was subject to disclosure under limited circumstances. Finally, the bar constructed by the juvenile records privilege deprived the defense of the only opportunity to show the witness' bias and ulterior motive for testifying against the defendant. *Id.* at 316-318; see also *Olden v Kentucky,* 488 US 227; 109 S Ct 480; 102 L Ed 2d 513 (1988). The Court in *Davis* affirmed that revealing a witness' motive for testifying is included within

the protected right of cross-examination. As Mc-Cormick notes in discussing the case:

> In the first instance, it is probable that the defendant's ability to challenge claims of privilege as impairing his "right to present a defense" will to some extent be dependent upon the criticality to that defense of the matter protected by the privilege. In *Davis,* the privileged matter in effect represented a significant and irreplaceable means of impeaching the chief prosecution witness. By contrast, where the privileged matter desired is of significantly lesser probative force or simply cumulative, its denial to the defendant has been held not to violate the constitutional guarantees. [McCormick, Evidence (3d ed), § 74.2, p 179.]

Thus, a case for the necessity of disclosure of privileged information is not made out if the information sought is merely cumulative of evidence otherwise available to the defendant.

It thus appears that the test of constitutional relevancy for disclosure purposes is that the evidence must be material in the sense that it would make a difference in the outcome[37] and necessary, in the sense that it is not merely cumulative of other nonprivileged evidence that would serve the same purpose, a formulation that is roughly akin to the majority's test for in camera review.

Several other sources support the conclusion that the majority's test for in camera review is an appropriate standard for disclosure and use of material protected by a privilege. First, on close inspection, every case from the United States Su-

---

[37] Compare one commentator's suggestion that the materiality standard for private privileges is whether the evidence is sufficiently probative to probably create a reasonable doubt regarding the truth of a witness' testimony if offered to impeach or probably create a reasonable doubt regarding a defendant's guilt if offered on the merits of the defense. Weisberg, n 29 *supra* at 959-964.

preme Court on its facts indicates a necessity for the protected information. See *Ritchie, Roviaro, Nixon,* and *Davis, supra.* Second, the work product privilege formally recognized in the federal civil procedure rules requires that the party seeking disclosure must show that without undue hardship he cannot obtain "the substantial equivalent of the materials by other means." FR Civ P 26(b)(3). Although a defendant's right to due process in a criminal trial obviously weighs more heavily in the balancing process than in a civil case, the centrality of the attorney-client privilege is such that the adoption of a necessity test as a middle road between open discovery and an absolute privilege is some evidence of the limiting principle the Supreme Court might endorse in resolving the tension between competing rights when other privileges are challenged. Third, the rejected standards for invocation of and exceptions to the informers privilege originally proposed in the Federal Rules of Evidence in pertinent part provide:

> If the judge [after an in camera review] finds that there is a reasonable probability that the informer can give the testimony, [necessary to a fair determination of the issue of guilt or innocence in a criminal case] and the government elects not to disclose his identity, the judge on motion of the defendant in a criminal case shall dismiss the charges to which the testimony would relate . . . . [2 Weinstein & Berger, Evidence, Proposed Supreme Court Standard 510(c)(2)—Identity of Informer, pp 510-1 to 510-2.]

Although not ultimately adopted, the proposed standard encompasses the advisory committee's recommendation that disclosure should be available on a showing of reasonable probability that privileged information is necessary to a fair determination of guilt or innocence.

Finally, other states enacting standards directing when a privilege can be overcome provide for admission where (1) the information is relevant to an essential issue in the case, (2) there are no available alternative means to obtain the substantial equivalent of the information, and (3) the need for the information outweighs the interest against disclosure, or the value of the material as it bears on the issue of guilt or innocence outweighs the privilege against disclosure.[38] See, e.g., Ky R Evid 506 (counselor-client privilege), NJ R Evid 508 (newsperson's privilege), quoted in 2 Weinstein & Berger, ¶ 501, pp 501-120 to 501-124 (1994 Supp).

The only state my research has located that specifically addresses the standard for disclosure of material protected by a counselor-client privilege, including a sexual assault counselor, provides that otherwise privileged communications may be disclosed:

> "(2) if the judge finds:
> "(A) That the substance of the communication is relevant to an essential issue in the case;
> "(B) That there are no available alternate means to obtain the substantial equivalent of the communication and;
> "(C) That the need for the information outweighs the interest protected by the privilege. The court may receive evidence in camera to make findings under this rule." [Ky R Evid 506(d)(2), quoted in 2 Weinstein & Berger, ¶ 501, p 501-124 (1994 Supp).]

---

[38] While this final standard might appear to beg the core question we have attempted to answer today, it may also acknowledge the possibility of some limited privilege whose importance transcends the determination of guilt or innocence (such as strategic military secrets), allow for the accommodation of the defendant's interests in a manner outside the conventional realm of discovery, or encompass the discretionary issue whether the prejudicial effect of the evidence outweighs its probative value. These explanations, at least to some degree, may be subsumed by the intermediate review of absolute privileges I have described.

These sources uniformly endorse a principle of materiality and necessity for trial judges to apply in making the disclosure decision that is consistent with the majority's test for in camera review. On a finding that there is no available alternate means "to obtain the substantial equivalent" of the protected information, the judge must order disclosure of evidence relevant to a substantial issue in the case when there is a reasonable probability that the protected information will affect the factfinder's determination of guilt or innocence.

B

Applying these principles to the issue of disclosure in the present cases, defendant Stanaway has shown no basis for allowing him access to the privileged information. The defendant made no more than a generalized request for review of the complainant's sexual assault counselor's records to potentially find useful impeachment information. This falls far short of a showing that discovery of the privileged records is either necessary or material to test the complainant's credibility on cross-examination. The defendant has simply failed to demonstrate that effective cross-examination is unavailable because of the privilege bar. As noted by the majority, "statements made to a counselor are not the only avenue . . . available for exploration regarding the complainant's credibility." *Ante* at 682, n 42.

In defendant Caruso's case, the showing made to this point is likewise insufficient. As we have noted, the need for the absolutely protected record was partially based upon a belief that the complainant had written sexually suggestive notes to her mother's fiancé. Conflicting testimony from several witnesses has already been presented at a

pretrial hearing concerning this note. Moreover, it
has not been suggested that the defendant has not
been afforded informal discovery making available
all the material in the prosecutor's possession.
Thus, this basis for disclosure calls for only cumu-
lative material. However, defendant also asserts
that the eight-year-old victim's knowledge of sex-
ual activity is necessary to examine the complain-
ant regarding its theory that the incident in ques-
tion was fabricated and that there is some connec-
tion between a failure of prior counseling, previous
sexual abuse by her father, and a theory of fabri-
cation. If Caruso is able to make the additional
showing of relevancy I have previously described,
the trial court should reevaluate these claims. If
the trial judge determines at the intermediate
stage of review that the privilege can be accommo-
dated, in camera review may require disclosure[39]
on the basis of the materiality to and necessity for
the requested records in order to conduct an effec-
tive cross-examination. It must be remembered in
this regard that defendant has not only the usual
means of cross-examination available to explore
the witness' knowledge, but can additionally ex-
plore at that time the alleged sexually explicit
nature of the notes described above.

I have written separately regarding the standard
for in camera review, and disclosure and use, of
information protected by privilege because I dis-
agree with the majority's initial standard for in
camera review and because of the majority's fail-
ure to meaningfully distinguish between that stan-

[39] The disclosure decision does not contemplate the eye of the
advocate, but where questions arise in the process in which the
assistance of counsel would be helpful, it is within the discretion of
the trial court to seek their assistance, *Nixon, supra* at 715, n 21,
subject to appropriate directive that unless disclosure is ordered, no
in camera information is to be revealed to anyone, including the
defendant. *Id.* at 716.

dard and the standard for disclosure and use. More importantly, I have written separately because I identify so strongly with the position of a trial court judge who is directed to administer a ruling without guidance in its application.

The approach I have suggested protects absolutely privileged private communications. It limits the availability of in camera review in respect to absolute privileges, and applies a standard that permits the balancing of societal interests against the defendant's due process interests and disclosure. It is also consistent with the limitations of statutory relevance we have previously found constitutional. *People v Arenda,* 416 Mich 1; 330 NW2d 814 (1982); *People v Hackett,* 421 Mich 338; 365 NW2d 120 (1984). Lacking clear direction from the United States Supreme Court, I offer these suggestions, which are a necessarily limited vision of the direction of that jurisprudence, mindful of the frontline responsibility of the trial judiciary to harmonize legislative purpose with the fair ascertainment of truth that is the basic assurance of due process. In the end, there is no surer guide to the resolution of the issues presented here than the experience of trial court judges, as they attempt to strike the delicate balance between upholding the interest protected by a privilege and assuring the integrity of the constitutional guarantee of a fair trial.

RILEY, J., concurred with BOYLE, J.

LEVIN, J. (*separate opinion*). I have signed Justice BRICKLEY's opinion, but would permit a lawyer for the accused to participate in an in camera examination for the reasons stated by the Supreme Judicial Court of Massachusetts in *Com-*

*monwealth v Stockhammer,* 409 Mass 867, 881-884; 570 NE2d 992 (1991):*

The United States Supreme Court has held that, where a criminal defendant desires access to privileged records of the confidential communications of the complaining witness, the interests of the defendant and the State in a fair trial are fully protected by an in camera review of those records by the trial judge. See *Pennsylvania v Ritchie,* 480 US 39, 59-61 [107 S Ct 989; 94 L Ed 2d 40] (1987). This holding does not necessarily answer the question before us, however, because, in the past, "on similar facts, we have reached different results under the State Constitution from those that were reached by the Supreme Court of the United States under the Federal Constitution." *Commonwealth v Upton,* 394 Mass 363, 372 [476 NE2d 548] (1985), and cases cited. Thus, in *Commonwealth v Clancy,* 402 Mass 664 [524 NE2d 395] (1988), we rejected the defendant's argument—predicated solely on Federal constitutional principles—that he was entitled to examine the medical records of the chief prosecution witness. At the same time, we reserved the question whether the result would be the same under the Massachusetts Declaration of Rights. See *id.* at 670. See also *Commonwealth v Jones,* 404 Mass 339, 340-344 [535 NE2d 221] (1989) (rejecting argument that Federal Constitution requires more than in camera review of requested DSS records, and expressly declining to address unraised State law question).

The Federal standard requiring only an in camera review by the trial judge of privileged records requested by the defendant rests on the assumptions that trial judges can temporarily and effectively assume the role of advocate when examining such records; and that the interests of the State and complainant in the confidentiality of the records cannot adequately be protected in any other way. Neither assumption withstands close scrutiny.

---

* Similarly, see *Zaal v State,* 326 Md 54; 602 A2d 1247 (1992).

As to the first assumption, the United States Supreme Court has said that " 'it [is] extremely difficult for even the most able and experienced trial judge under the pressures of conducting a trial to pick out all of the [information] that would be useful in impeaching a witness.' . . . Nor is it realistic to assume that the trial court's judgment as to the utility of material for impeachment . . . would exhaust the possibilities. In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." (Citation omitted.) *Dennis v United States,* 384 US 855, 874-875 [86 S Ct 1840; 16 L Ed 2d 973] (1966). We have expressed a similar concern: "The danger lurking in the practice of . . . in camera review [of privileged documents] by the trial judge is a confusion between the roles of trial judge and defense counsel. The judge is not necessarily in the best position to know what is necessary to the defense." *Commonwealth v Clancy, supra* at 670. See *Commonwealth v Liebman,* 388 Mass 483, 489 [446 NE2d 714] (1983) ("[W]hen a judge undertakes to decide if [evidence] benefits the defendant's case he is 'assuming vicariously and uncomfortably the role of counsel' ").

Regarding the second assumption, we are not convinced that the interests of the State and the complaining witness in preserving the confidentiality of communications to psychotherapists and social workers can *only* be protected by an in camera review procedure. Trial judges have broad discretion to control the proceedings before them. There is no reason why they cannot take steps to insure that breaches of confidentiality attending discovery are limited only to those absolutely and unavoidably necessary to the preparation and presentation of the defendant's defense. For example, judges could allow counsel access to privileged records only in their capacity as officers of the court. Admission of or reference to any such information at trial could be conditioned on a determination (made after an in camera hearing) that the

information counsel seeks to use is not available from any other source. Cf. *Commonwealth v Two Juveniles,* 397 Mass 261, 269 [491 NE2d 234] (1986); *Commonwealth v Jones, supra* at 345 (Lynch, J., dissenting). Protective orders (enforced by the threat of sanctions) requiring counsel and other necessary participants in the trial not to disclose such information could be entered. See *Commonwealth v Amral,* 407 Mass 511, 526-527 [554 NE2d 1189 (1990) (Liacos, C.J. [concurring]). Although these procedures would result in counsel for the defendant and the Commonwealth, rather than just the judge, viewing privileged records, if ·careful precautions in the order of those described above are taken, such breaches of confidentiality need not be any more intrusive or harmful than those attending in camera review of records by the judge alone.

In addition to rejecting the assumptions that support the Federal standard, we note that § 20B of G.L. c. 233, and § 135 of G.L. c. 112, are not statements of absolute privilege, unlike certain other statutory testimonial privileges such as G.L. c. 233, § 20A (priest/penitent), and G.L. c. 233, § 20J (sexual assault counselor/victim). See *Commonwealth v Jones, supra* at 343. Both sections contain exceptions limiting their scope. As such, the privileges at issue here derive from a "less firmly based legislative concern . . . for the inviolability of the communication being protected." *Commonwealth v Two Juveniles, supra* at 266.

Balanced against these qualified privileges are important State constitutional rights of the defendant. Because we have said that, in appropriate circumstances, even absolute statutory privileges (nonconstitutionally based) must yield to a defendant's constitutional right to use privileged communications in his defense, see *id.,* we are not persuaded that allowing counsel access to the treatment records at issue in this case would do great violence to the less firmly based policies represented by §§ 20B and 135. In these circumstances, those policies must give way to the defen-

dant's need to examine the complainant's treatment records.

Accordingly, we conclude that, under art 12 of the Massachusetts Declaration of Rights, counsel for the defendant is entitled to review the records of the complainant's treatment at the New York Hospital and with the Greenwich, Connecticut, social worker to search for evidence of bias, prejudice, or motive to lie. On remand, the judge shall determine the circumstances under which counsel for the defendant and the Commonwealth shall review the records. The judge then shall conduct an in camera hearing concerning the admissibility of any information in the records that counsel may wish to use at trial. In his discretion, the judge also shall enter any orders that are deemed appropriate to ensure that the information contained in the records will not be disclosed beyond the defendant's need to prepare and present his defense.